Law Offices of Jared M. Lefkowitz
250 Park Avenue, Suite 2020
New York, NY 10177
T (212) 682-1440
F (917) 591-8991
JML@JMLefkowitzLaw.com
*Attorney for Plaintiff Noel Wallen*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
NOEL WALLEN,

             Plaintiff,

  - against -

TEKNAVO GROUP,

             Defendant.
--------------------------------------------------X

Case No. CV 12 6196

**COMPLAINT**    BRODIE, J.

POHORELSKY, M.J.

JURY TRIAL DEMANDED

      Plaintiff Noel Wallen, by and through his counsel Jared Lefkowitz, as and for his complaint against the above captioned Defendant alleges as follows:

      1. This is an action under Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act for employment discrimination based upon Plaintiff's race/color, national origin, disability/perceived disability, and retaliation.

## PARTIES, JURISDICTION, AND VENUE

2. Plaintiff resides at 212-29 Hillside Ave., Apt. 6AE, Queens Village, NY 11427.

3. Defendant's principal place of business is 399 Park Avenue, 8th Floor, New York NY 10022.

4. This Court has subject mater jurisdiction based upon Title VII of the Civil Rights Act of 1964, 42 USC §2000e *et seq.* and the Americans with Disabilities Act, 42 USC §12101 *et seq.*

5. Plaintiff filed a Charge with the New York State Division of Human Rights and the EEOC thereafter adopted the findings of the DHR and issued a Right to Sue Letter dated September 25, 2012.

## ALLEGATIONS APPLICABLE TO ALL COUNTS

6. Plaintiff is a black, male computer software engineer who was born in and attended university in the West Indies, as well as in New York.

7. Plaintiff suffers from astigmatism which causes difficulty when reading in low lighting, sore eyes, and headaches, as well as other stress-related conditions. The discrimination suffered by Plaintiff exacerbated these conditions, as well as caused Plaintiff to suffer a stroke.

2

8. Plaintiff was hired by Defendant Teknavo on September 1, 2010 as a Senior Computer Programmer/Analyst.

9. Teknavo has a contract to perform services for the Operations, Product and Sales Group at Bloomberg, LP, and Plaintiff was assigned to work on this project for Bloomberg.

10. Initially, Oleg Tsarkov ("Tsarkov"), a Russian, Caucasian man and Plaintiff were the only programmer/analysts on the team. Frank Lapiana ("Lapiana"), Caucasian, was later hired as a programmer/analyst. Anatoly Ditinsky ("Ditinsky"), a Russian, Caucasian man, was the program manager and was Plaintiff's direct supervisor and boss.

11. Despite Plaintiff's long and positive history as a software engineer, Teknavo and Ditinsky subjected Plaintiff to discriminatory treatment because of his race/color and national origin by singling him out for disparate treatment and applying policies and standards differently to him, while affording Caucasian team members more favorable treatment and by failing to prevent other employees from discriminating against him. Such discrimination culminated in Plaintiff's termination.

12. Similarly situated Caucasian employees were allowed to work off of the premises most Fridays. Ditinsky allowed these employees to phone into conference calls during project status meetings. This privilege was not granted to Plaintiff unless

3

he could provide an excuse, though similarly situated Caucasian employees were not similarly asked to provide excuses.

13. Plaintiff was required to produce his work in hard copy for both Lapiana and Tsarkov to scrutinize and possibly reject even though they were not Plaintiff's supervisors. Many times the work rejected by them was correct, as later validated by a senior engineer, Charlie Davis, and other engineers. Similarly situated Caucasian employees would only have to casually state what they were working on without evidence, and this was acceptable to Ditinsky.

14. Except for Lapiana, all others on the programming team spoke Russian. Discussions on projects were often held in Russian. As a result, Plaintiff was unable to learn pertinent information about his projects.

15. Ditinsky regularly provided different and undesirable work assignments to Plaintiff. Assignments given to Lapiana and Tsarkov often involved more technical and program-oriented tasks. Ditinsky also made it difficult for Plaintiff to successfully complete assigned tasks by limiting his interaction with necessary employees. Ditinsky did not intervene in the projects of similarly situated Caucasian employees in a way that made it difficult for them to complete tasks.

16. Ditinsky regularly instructed Plaintiff not to attend meetings with superiors within the Bloomberg organization to which they were both invited or by

4

himself, telling him that as manager he has final say. As a result, Plaintiff missed valuable opportunities to interact with Bloomberg employees, affecting his ability for advancement.

17. Ditinsky also made false promises regarding Plaintiff's opportunities for additional training and advancement, while reducing the technicality of projects assigned to Plaintiff.

18. Ditinsky did not undermine similarly situated Caucasian and Russian employees' chances for advancement and did not attempt to create negative impressions of similarly situated Caucasian and Russian employees.

19. During the week of September 9, 2010, Tsarkov told Plaintiff he was surprised to see an African American Software Engineer. Plaintiff further inquired into the statement and Tsarkov explained when immigrants first encounter African Americans, "you cannot help but conclude that they are not smart."

20. In November 2010, Lapiana screamed at Plaintiff in a belligerent and humiliating tone during a group meeting. He questioned Plaintiff's purpose on the team. He and Oleg then ignored Plaintiff for the rest of the meeting. Plaintiff was shocked by Lapiana's unwarranted and unprovoked outburst. Lapiana, who was not Plaintiff's supervisor, criticized Plaintiff's work by sending emails to Ditinsky and other members of the project and often falsely accused Plaintiff of copying other employee's work.

5

21. No actions were taken by Ditinsky or Teknavo to reprimand or correct Lapiana's behavior.

22. After the above-mentioned meeting, Plaintiff spoke to Raquel Cano-Schneiderman ("Cano-Sniederman") (Senior Salesperson with Bloomberg LP and liaison between Teknavo and Bloomberg) regarding his concerns with Lapiana's discriminatory treatment. Cano-Sniederman suggested he speak to Tom Cox ("Cox"), owner of Teknavo.

23. Plaintiff met with Cox and complained about Lapiana's discriminatory and hostile treatment of him. Plaintiff told Cox that he feared an escalation of this behavior. Plaintiff further informed Cox of Tsarkov's statements regarding African-Americans not being smart. Cox assured Plaintiff that this behavior would not be tolerated and that he would follow up with Plaintiff at a later date. Cox also suggested that Plaintiff speak to Ditinsky regarding Lapiana's behavior. No action was ever taken against Lapiana or Tsarkov.

24. In November 2010, Plaintiff met with Ditinsky to discuss his concerns regarding Lapiana's harassment. Ditinsky dismissed Plaintiff's concerns in stating that Plaintiff must accept Lapiana's ways.

25. In November 2010, Ditinsky delivered Plaintiff's paycheck to him in an already opened envelope. Ditinsky's explanation was that Cassandra Kinyon

("Kinyon"), office manager had accidentally opened it. Plaintiff asked Kinyon, who denied this.

26. Ditinsky would convene technical meetings with the rest of the project team except for Plaintiff. Ditinsky knowingly sent invitations to the meeting during the time when Plaintiff ate lunch everyday. On November 29, 2010, Plaintiff spoke to Ditinsky regarding this disparate treatment but such treatment continued. Similarly situated Caucasian employees were always invited to or given notice of meetings, while Plaintiff was not.

27. In January 2011, the entire Teknavo team relocated to the 19th Floor at Bloomberg and each employee was assigned to a new computer. Similarly situated Russian and Caucasian employees, and employees who did not complain of discrimination, were allowed by Ditinsky to acquire programming resources and documentation before Plaintiff had access.

28. Prior to relocating, Ditinsky instructed the team to select their new seat locations. Plaintiff chose a window seat because it provided adequate lighting for Plaintiff's astigmatism, a need which he communicated to Ditinsky. When the team moved to the 19th Floor, Ditinsky ignored Plaintiff's medical concerns and assigned Plaintiff to a workspace away from the windows and near a dark passageway, thus denying his request for a reasonable accommodation. All Russian, Caucasian men were

assigned to window seats.

29. Plaintiff reminded Ditinsky of his accommodation request. Ditinsky allowed Plaintiff to sit near a window only after other team members provided support for Plaintiff. Similarly situated Caucasian and Russian employees, with less seniority than Plaintiff and who did not request assignments based upon medical reasons, were given preferential treatment in seat assignments.

30. On March 22, 2011, Plaintiff and Lapiana disagreed on the handling of a work issue. A belligerent and boisterous Lapiana displayed an eagerness to fight when he went into a rage, waving his hands at Plaintiff, telling him that "people of your type are stupid so you should listen." Other employees witnessed this incident.

31. Plaintiff repeated Lapiana's comments to Ditinsky and relayed his concerns regarding Lapiana's behavior. Ditinsky called a team meeting. Lapiana later emailed Plaintiff a letter of apology. No further action was taken against Lapiana.

32. On May 23, 2011, all the project team members attended a meeting and neglected to include Plaintiff. Plaintiff complained to Cox about being left out of the meeting and how he was being treated differently than other similarly situated Caucasian employees. No action was taken to respond to Plaintiff's complaints of discrimination.

8

33. As of May 24, 2011, Plaintiff's large workload of tasks was reassigned to other team members with less seniority as well as other Russian programmers who had just arrived from St. Petersberg and who worked in another group.

34. On June 15, 2011, Ditinsky interrogated Plaintiff at a project meeting regarding a sonogram that he had taken. Ditinsky asked Plaintiff in front of the whole group why he had to get a sonogram, making Plaintiff feel very uncomfortable having to discuss his medical situation. Ditinsky never revealed any confidential medical information of similarly situated Caucasian employees.

35. On June 28, 2011, Plaintiff attended a project status meeting. At this meeting, Plaintiff reasonably asked Lapiana to provide him with certain information relevant to a joint project. Lapiana's response was to yell at Plaintiff in a very demeaning way. Plaintiff was shocked at this unwarranted outburst. Ditinsky witnessed Lapiana's unwarranted outburst but did not intervene or reprimand Lapiana.

36. On July 1, 2011 Plaintiff complained to Cox about the incident at the meeting on June 28, 2011 and Lapiana's discriminatory treatment. Plaintiff asked Cox if they could discuss Plaintiff's situation. Cox said he would talk to Lapiana and Ditinsky about the hostility and discrimination towards Plaintiff, and also that they would be able to discuss this further at a meeting on Tuesday, July 5, 2011. Cox then

9

later instructed Plaintiff not to report to his customary worksite at Bloomberg but instead to report to the Teknavo office.

37. On July 5, 2011, Plaintiff met with Cox and Kinyon to discuss the harassment and discrimination he suffered at work. Instead of discussing these issues, Cox terminated Plaintiff's employment.

38. Teknavo claimed that his termination was a part of a general lay-off plan. The reason cited by Teknavo is pretext for discriminating against Plaintiff because of his race/color, national origin, disability/perceived disability, and in retaliation for his good faith complaints of discrimination.

39. Plaintiff was not the last employee hired in his group, never received any warnings of performance issues from his supervisors, and is more experienced than other employees working for Teknavo.

40. As a result of the discrimination and retaliation that he has experienced, Plaintiff has suffered from a very high level of stress, anxiety and depression which led to a loss of appetite, stomach cramps, insomnia, swollen ankles and increased blood pressure.

41. Although plaintiff is currently under the care of psychologist and psychiatrist, medical records had inferred that these work-related stressors could cause a deterioration of his emotional and mental health. Plaintiff eventually suffered a stroke

which has left him with paralysis for long term rehabilitation as well as physiological uncertainty.

## FIRST COUNT

42. For the reasons alleged above, Defendant Teknavo discriminated against plaintiff in violation of Title VII of the Civil Rights Act of 1964.

43. Plaintiff seeks damages in excess of $1,000,000 consisting of lost wages, future earnings, raises, bonuses, gratuities, other benefits he would have received, and any other damages available under the statute(s).

## SECOND COUNT

44. For the reasons alleged above, Defendant Teknavo retaliated against plaintiff in violation of Title VII of the Civil Rights Act of 1964.

45. Plaintiff seeks damages in excess of $1,000,000 consisting of lost wages, future earnings, raises, bonuses, gratuities, other benefits he would have received, and any other damages available under the statute(s).

## THIRD COUNT

46. For the reasons alleged above, Defendant Teknavo discriminated against plaintiff in violation of the Americans with Disabilities Act.

47. Plaintiff seeks damages in excess of $1,000,000 consisting of lost wages, future earnings, raises, bonuses, gratuities, other benefits he would have received, and any other damages available under the statute(s).

## FOURTH COUNT

48. For the reasons alleged above, Defendant Teknavo retaliated against plaintiff in violation of the Americans with Disabilities Act.

49. Plaintiff seeks damages in excess of $1,000,000 consisting of lost wages, future earnings, raises, bonuses, gratuities, other benefits he would have received, and any other damages available under the statute(s).

## FIFTH COUNT

50. For the reasons alleged above, plaintiff has suffered damages for emotional distress in an amount to be determined at trial.

**WHEREFORE**, plaintiff demands judgment as follows:

A.   On the first count, an amount in excess of $1,000,000 consisting of lost wages, future earnings, raises, bonuses, gratuities, other benefits he would have received, and any other damages available under the statute(s);

B.   On the second count, an amount in excess of $1,000,000 consisting of lost wages, future earnings, raises, bonuses, gratuities, other benefits he would have received, and any other damages available under the statute(s);

C.   On the third count, an amount in excess of $1,000,000 consisting of lost wages, future earnings, raises, bonuses, gratuities, other benefits he would have received, and any other damages available under the statute(s);

D.   On the fourth count, an amount in excess of $1,000,000 consisting of lost wages, future earnings, raises, bonuses, gratuities, other benefits he would have received, and any other damages available under the statute(s);

E.   On the fifth count, damages in an amount to be determined at trial; and

F.    Costs, attorneys fees, punitive damages, and such other and further relief as this Court deems just and proper.

Dated:    New York, New York
December 13, 2012

_____
Jared Lefkowitz, Esq. (JL 6920)
250 Park Avenue, Suite 2020
New York, NY 10177
Tel (212) 682-1440
Fax (917) 591-8991
JML@JMLefkowitzLaw.com
*Attorney for Plaintiff*