UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
NOEL O. WALLEN,

                              Plaintiff,

                                                    **REPORT AND**
            -against-                               **RECOMMENDATION**
                                                    12-CV-6196-MKB-SJB

TEKNAVO GROUP,
BLACKROCK CONSULTING, INC.,

                              Defendants.
-----------------------------------------------------------------X
**BULSARA, United States Magistrate Judge:**

        Plaintiff Noel O. Wallen ("Wallen") filed this employment discrimination action

against Defendants Teknavo Group ("Teknavo") and Blackrock Consulting, Inc.

("Blackrock")[1] under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

("Title VII") and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA").

Wallen has alleged three claims under Title VII: 1) race, color and national origin

discrimination; 2) hostile work environment; and 3) retaliation.  Wallen also has alleged

two claims under the ADA: 1) discrimination based on a failure to accommodate a

disability; and 2) retaliation.

        On July 25, 2017, Teknavo filed a motion for summary judgment.  On October 7,

2017, the motion was referred by the Honorable Margo K. Brodie to the undersigned for

a report and recommendation.  For the reasons stated below, it is respectfully

---

[1] Wallen was employed by Blackrock from 2010-2011.  (Declaration of Tom Cox
dated May 31, 2017 ("Cox Decl.") ¶ 2 n.1).  In July 2014, Blackrock changed its name to
Teknavo.  (*Id.*).  Although two defendants are sued, because they are a single employer,
the Court will refer to them collectively as Teknavo.

recommended that the motion be granted and judgment be entered in favor of Defendants.

I.  Legal Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways. Fed. R. Civ. P. 56(c)(1). It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations," "admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *see generally Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

"In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In cases involving claims of employment discrimination, "an extra measure of caution is merited" because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quotations omitted). However, "'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient' to defeat a summary judgment motion." *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252). And "conclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." *Ridinger v. Dow Jones & Co. Inc.*, 651 F.3d 309, 317 (2d Cir. 2011) (quotations omitted); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). Likewise, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000). A plaintiff's self-serving statement, without direct or circumstantial evidence to support the charge of discrimination, is also insufficient. *Fincher v. Depository Trust & Clearing Corp.*, No. 06-CV-9959, 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008), *aff'd*, 604 F.3d 712 (2d Cir. 2010). As such, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

In this case, Wallen is proceeding *pro se* and although he had counsel earlier in the case, he responded to this motion without representation. Although the same standards for summary judgment apply, a *pro se* litigant "should be given special latitude in responding to [a summary judgment] motion." *Gonzalez v. Long*, 889 F. Supp. 639, 642 (E.D.N.Y. 1995); *see also Graham v. Lewinski*, 848 F.2d 342, 344 (2d

Cir. 1988) ("[S]pecial solitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment.").

In light of the extensive submissions and the lengthy objections to them, the Court outlines the standards for determining what facts are beyond genuine dispute and supported by admissible evidence.

In moving for summary judgment or answering such a motion pursuant to Fed. R. Civ. P. 56, litigants in this District are required by the Local Rules to provide a statement setting forth purported undisputed facts or if controverting any fact, responding to each assertion. In both instances, the party must support its position by citing to admissible evidence from the record. *See* Local Rule 56.1(b), (d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).

Teknavo submitted a Rule 56.1 Statement containing its allegedly uncontested material facts with citations to underlying evidence. Wallen provided objections to that Statement. However, many of the objections are in the form of argument and conclusory denials that contain no citations to admissible evidence. *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("Rule 56.1 statements are not argument . . . They should not contain conclusions[.]"). Wallen is proceeding *pro se*, and this is understandable; however, the Court must disregard any conclusory unsupported assertions and conclusory denials. *Holtz*, 258 F.3d at 74.

Where genuinely disputed, "the Court will consider the sources for the claims made in dueling Rule 56.1 Statements when they are disputed, rather than rely on the Rule 56.1 Statements themselves[.]" *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 396 (S.D.N.Y. 2015). In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment motion as a whole—weigh evidence or assess the credibility of witnesses. *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). The parties have submitted several declarations in support of their respective positions. A "party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Dept. of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996). In addition, a court does not give any consideration to hearsay, speculation or inadmissible evidence in evaluating declarations or affidavits. *Crawford v. Dep't of Investigation*, No. 05-CV-5368, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007) (plaintiff may not rely on uncorroborated source, speculation, hearsay, conclusory allegations and other inadmissible evidence to defeat summary judgment), *aff'd*, 324 F. App'x 139 (2d Cir. 2009).

<u>Facts</u>

Unless otherwise noted, based on the review of the depositions, declarations, exhibits and other evidence and pleadings, the Court has determined the following facts are beyond genuine dispute and supported by admissible evidence:

I.    <u>The Parties</u>

Teknavo designs, builds and manages front office technology applications for the financial services sector. (Teknavo's Rule 56.1 Statement ("Rule 56.1 Stmt.") ¶ 1). Jay

Palmer ("Palmer") is CEO and Chief Operating Officer of Teknavo, and served in that role during Wallen's employment, when Teknavo was known as Blackrock Consulting (Deposition of Thomas J. Cox dated Dec. 14, 2016 ("Cox Dep.") at 9:21-24; Rule 56.1 Stmt. ¶ 2; Wallen's Response to Defendants' Rule 56.1 Stmt. ("Rule 56.1 Resp.") ¶ 2). Palmer's responsibilities include making decisions regarding "hiring, firing, demoting, and approving compensation of Teknavo employees." (Rule 56.1 Stmt. ¶ 3; Cox Dep. 11:13-19).

Thomas Cox ("Cox") is the President of DTC Consulting ("DTC"), an independent contractor of Teknavo. (Rule 56.1 Stmt. ¶ 7). DTC provides management consultant and other services to Teknavo. (*Id.*).

Walden Systems ("Walden") is also an independent contractor of Teknavo. (Rule 56.1 Stmt. ¶ 8; Cox Dep. 96:7-9). From on or about August 5, 2010 to the present, Walden has provided services to Teknavo and its clients. (Declaration of Anatoly Ditinsky dated May 31, 2017 ("Ditinsky Decl.") ¶ 3). Anatoly Ditinsky ("Ditinsky") is employed by Walden and provides services to clients of Teknavo. (*Id.*).

Plaintiff Wallen is a black Jamaican-American male, originally from the West Indies. (Declaration of Noel Wallen dated July 7, 2017 ("Wallen Decl.") ¶ 3). He is a naturalized U.S. Citizen. (*Id.*). Wallen has a bachelor's degree in applied physics, applied mathematics and a minor in operations research, (*id.* ¶ 4), a master's degree in telecommunication and computer science, and a diploma in project management, (*id.* ¶ 5). Wallen previously worked as a software engineer at a company called NCR, (*id.* ¶ 7), programmer/analyst at Bell Communication Research, (*id.*), software systems engineer for Digital Equipment Corp., (*id.* ¶ 8), and software engineer consultant at MF Global Financial (*id.* ¶ 10).

II.    The OPS Project

In or about May or June 2010, Cox assisted Teknavo in negotiations with Bloomberg L.P. ("Bloomberg") for a contract to analyze Bloomberg's Operations, Product and Sales Group (the "OPS Project").  (Cox Decl. ¶ 6).

Bloomberg issued a Purchase Order (the "2011 PO") to Teknavo for the OPS Project, in the amount of $2,641,657.89, and Teknavo planned to hire up to 8 developers to work on the project.  (Cox Decl. ¶¶ 10, 13).  The budget was for a 12-month period.[2]  (*Id.* ¶ 10).

Teknavo hired a number of employees to work on the OPS Project.  (*Id.* ¶ 16).  Ditinsky was assigned to serve as team leader and project manager.  He also established goals and supervised the team's progress.  (Cox Decl. ¶ 17; Ditinsky Decl. ¶ 8).  Although Cox set the direction for the Project, he did not interact on a daily basis with OPS team members.  (Cox Decl. ¶ 18; Rule 56.1 Stmt. & Resp. ¶ 21).  Ditinsky reported to Cox periodically on the team's progress.  (Rule 56.1 Stmt. & Resp. ¶ 22).

Cox made recommendations regarding hiring and termination of OPS team members, but did not have ultimate authority to make those decisions.  (Cox Dep. 93:15-24; Rule 56.1 Stmt. & Resp. ¶ 24).  Ditinsky did not have any responsibility for making decisions or recommendations regarding hiring, promotion, demotions of or compensation for OPS team members.  (Rule 56.1 Stmt. & Resp. ¶ 24; Ditinsky ¶ 10).

---

[2] Wallen asserts that this and other purchase orders are incomplete or falsified. (*See* Wallen's Opposition to Defendants' Motion for Summary Judgment dated November 8, 2017, Dkt. No. 146 ("Wallen Br.") at 92-93).  There is nothing to suggest these, or any other, documents submitted by Teknavo are incomplete or falsified, and the Court does not credit these allegations.  In any event, even were the Court to ignore these documents, the outcome of this Court's recommendation would not change, in light of the other undisputed evidence.

In addition to Ditinsky, the OPS team included Yuri Khupchenko, Alexander Nachayev, Oleg Tsarkov, Frank LaPiana, Michael Keeler, Constantine Papadopoulos and Wallen. (Ditinsky Decl. ¶ 7). Wallen did not speak Russian; neither did LaPiana, Keeler and Papadopoulos. (*Id.*). Three of them were developers: Wallen, Tsarkov, and LaPiana. (Rule 56.1 Stmt. ¶ 36, Cox Decl. ¶ 29). Wallen contends that only three programmers—Wallen, Tsarkov, and LaPiana—worked on the OPS Project. (Rule 56.1 Resp. ¶ 36). Khupchenko worked as the OPS Project's Account Manager and served as a human resources representative.[3] (Rule 56.1 Resp. ¶¶ 35, 36; Wallen Decl. ¶ 22).

III.    Wallen's Employment

Wallen was hired as a Senior Systems Analyst/Programmer for the OPS Project on September 1, 2010; his employment was terminated approximately 10 months later on July 5, 2011. (Rule 56.1 Stmt. & Resp. ¶¶ 26-28). Wallen alleges he actually commenced working in August 2010. (Wallen Decl. ¶ 12). Wallen did not know who his direct boss was; Wallen understood that Cox "employed" him. (Wallen Dep. 88:6-11). Wallen was told by Cox that Ditinsky was going to manage the OPS team. (*Id.* 88:12-18).

A.    Unfair and Negative Treatment

During the course of his employment, Wallen experienced various episodes of negative or unfair treatment:

1.    Although Ditinsky permitted Tsarkov and LaPiana (Wallen's co-workers) to call in rather than attend meetings in person, and permitted them to work from home

---

[3] Teknavo's claim that Khupchenko was also a programmer is undercut by its own evidence. (*See* Cox Dep., Ex. 8, Dkt. No. 144-1 at 39 ("The other employees that work with that client that is letting two employees go & have similar positions are below: [LaPiana . . .]," [but not Khupchenko]).

most Fridays, Wallen could not do so, unless he provided an excuse. (Rule 56.1 Stmt. & Resp. ¶ 49(a)). Wallen was also not permitted to come to work late, although Tsarkov and LaPiana (or other Caucasian co-workers) were permitted to do so. (Rule 56.1 Stmt. & Resp. ¶ 49(b)). Wallen, however, never asked to come in late, and did not ask that the time of meetings be changed. (Rule 56.1 Stmt. & Resp. ¶ 50; Wallen Dep. 149:11-13). On one occasion, when he did ask to work from home, Wallen was permitted to do so. (Rule 56.1 Stmt. & Resp. ¶ 51).

2.      Wallen was required to produce his work in hard copy for other members of the OPS Project, including LaPiana and Tsarkov, to scrutinize, but similarly situated Caucasian employees did not have to do so. (Rule 56.1 Stmt. & Resp. ¶ 49(c); Wallen Dep. 159:2-20).

3.      Discussions were held in Russian; as a result, Wallen could not learn pertinent information relevant to his work. (Rule 56.1 Stmt. & Resp. ¶ 49(d)). There were at least two, and potentially three, other OPS members who did not speak Russian. (Wallen Dep. 168:15-25). While at work, Wallen never voiced an objection to people speaking Russian. (*Id.* at 171:20-22.)

3.      Wallen was given different and undesirable assignments, in comparison to his Caucasian colleagues. (Wallen Dep. 176:6-179:23). Ditinsky screened Wallen from certain tasks. (*Id.* 87:20-88:3). For example, his assignments were reduced to conducting what Wallen described as operational tasks, such as reading and preparing training manuals. (*Id.* 89:10-19.). Wallen was also required to develop programing questions for a Russian programmer who needed them to pass an exam. (*Id.* 175:2-5). Among other operational tasks, Wallen was also required to take error logs and place them into spreadsheets, something which took the greater part of an entire day. (*Id.*

175:6-176:10).  He was required to perform these error logging tasks "most days," after the team moved work locations to the 19th floor of the Bloomberg building in January 2011.  (*Id*.; Ditinsky Decl. ¶ 12).

At one point, Wallen was informed that he had to assist Pamela Hastings, who worked for Cox, but was not assigned to the OPS Project.  (Cox Dep. 96:15-18; Wallen Dep. 89:15-91:2-3).  Wallen does not know when he was asked to assist Hastings, but estimates that it was around March 2011 and continued until his termination.  (*Id*.).

These operational tasks took time away from Wallen's technical and programming work.  (Wallen Dep. 232:5-22).  According to Wallen, other team members did not have to develop questions or read manuals on a consistent basis.  (*Id*. 178:2-4).  Wallen observed that other team members were not asked to perform operational tasks with the same frequency, intensity, or in some instances, at all.  (*Id*. 179:11-23; 233:5-10.).  The "majority of the time" other team members were doing something "technical regarding programming."  (*Id*. 179:17-19).

Ditinsky states in his declaration that none of the tasks Wallen was assigned fell outside of his job duties.  (Ditinsky Decl. ¶ 11).  Ditinsky does not address whether Wallen was assigned to tasks that were different than those assigned to other OPS team members; whether Wallen was working on more operational and less programming tasks; or whether Wallen's colleagues were given more programming work than he was given.  (*See id*.).  Wallen, for his part, indicates that although there were no defined "duties" for his position, in light of his prior experience, and the fact that he was hired to do "[a]nalysis, design, and programming," the operational tasks were not commensurate with his job title.  (Rule 56.1 Resp. ¶ 57).

4.      Ditinsky made it difficult for Wallen "to successfully complete assigned tasks by limiting his interaction with necessary employees." (Compl. ¶ 15).  Specifically, Ditinsky regularly instructed Wallen not to attend meetings with individuals at Bloomberg, and limited Wallen's interaction with Bloomberg employees.  (Wallen Dep. 198:15-23).  Ditinsky does not deny doing so.  (*See* Ditinsky Decl.).  Nonetheless, another OPS team member, Michael Keeler, did attend meetings with Bloomberg, and shared his notes with Wallen.  (Wallen Dep. 201:21-202:5).  Wallen also knew Charlie Davis, a Bloomberg senior technical employee, who was "very [knowledgeable] and provided [Wallen] with enough guidance to hurdle the obstacles" Ditinsky put in his way.  (Wallen Decl. ¶ 82).

5.      Ditinsky also excluded Wallen from (approximately three to four) meetings, including technical meetings that other OPS team members were invited to. (Wallen Dep. 212:25-213:14).  In October 2010, Ditinsky chose another employee to make a presentation to Bloomberg about a project that Wallen had worked on.  (Wallen Decl. ¶¶ 21, 78-82).  There was also a November 29, 2010 technical meeting that Wallen was invited to, but did not attend, because he was sent the invitation while he was away at lunch (which Wallen alleges Ditinsky knew).  (Wallen Dep. 218:12-221:25).  Ditinsky does not deny excluding Wallen from such meetings.  (*See* Ditinsky Decl.).  Wallen did not know why Ditinsky did not want him to attend two such meetings.  (Wallen Dep. 206:11-19; 208:11-13).  And Wallen generally does not know whether other OPS team members were told not to attend meetings, (Wallen Dep. 211:19-22).

6.      According to Wallen, Caucasian employees received more favorable treatment and opportunities for advancement.  (Compl. ¶¶ 17-18).

The more favorable treatment is a more general way of characterizing Wallen's exclusion from meetings and disparate working conditions (like not being permitted to work from home), which are discussed above. (Wallen Dep. 146:14-147:14). As for the opportunities for advancement, these are opportunities that LaPiana and Tsarkov were given to test various APIs that Wallen was never given access to, (Wallen Dep. 234:5-235:19), or to learn other programming languages (like Python), (*id.* 236:19-237:24).[4]

Relatedly, Wallen did not receive programming resources (such as software and development tools) at the same time as other OPS team members, after the team moved to the 19th Floor of the Bloomberg building. (Wallen Dep. 136:15-137:19). There was an approximately a three-month delay before Wallen received these resources, although he did receive them. (*Id.* at 137:15-19).

7.      On one occasion Ditinsky delivered Wallen's paycheck to him in an opened envelope. (Wallen Dep. 278:3-16). Wallen did not know if other employees received paychecks in open envelopes. (Wallen Dep. 282:16-20).

8.      As of May 24, 2011, Wallen's tasks were reassigned to other team members with less seniority (such as LaPiana) and Russian programmers who had arrived from St. Petersburg. (Wallen Dep. 283:18-23). Wallen alleges that the reassignments were of programming tasks, although he could not identify the specific tasks, the names of the

---

[4] An API or application programming interface is a set of functions and procedures allowing the creation of applications that access the features or data of an operating system, application, or other service. *API*, Oxford Living Dictionaries, *available at* https://en.oxforddictionaries.com/definition/api (last visited Feb. 14, 2018, 7:32 PM). Python is a high-level general-purpose programming language. *Python*, Oxford Living Dictionaries, *available at* https://en.oxforddictionaries.com/definition/python (last visited Feb. 14, 2018, 7:32 PM).

programmers, or whether these programmers were, in fact, working on an entirely different project.  (Wallen Dep. 284:18-286:2).

9.      Wallen was not paid a bonus in February 2011; he believes  bonuses were paid to white Russian employees.  (Wallen Decl. ¶ 201).[5]

B.  Racially Motivated and/or Derogatory Comments

Wallen recounted the following instances of racially motivated and derogatory comments that were directed towards him:

During the week of September 9, 2010, Wallen's co-worker, Tsarkov, told Wallen he was surprised to see an African-American software engineer and that "when immigrants first encounter African Americans, 'you cannot help but conclude that they are not smart.'"  (Wallen Dep. 238:11-239:18).  Wallen reported this comment to Cox around November 2010.[6]  (*Id*. 260:21-261:25).

In November 2010, LaPiana screamed at Wallen in a group meeting.  (Wallen Dep. 244:7-16).  Wallen does not remember the exact words said, (*id*. 244:17-20), but the general connotation was to make Wallen feel inferior and LaPiana superior.  (*Id*. 245:5-12).[7]

_____

[5] This allegation is not in the Complaint, and was not a subject of Wallen's deposition.  Wallen makes the claim for the first time in his declaration in support of his opposition to summary judgment.

[6] In its summary judgment papers, Tekanvo argues that Wallen told Cox Tsarkov's comment was innocent or benign, (*see* Rule 56.1 Stmt. ¶ 72), but that takes Wallen's deposition testimony out of context.  (Wallen Dep. 240:17-241:20 (Q: "What did you say to Mr. Cox pertaining to this comment by Mr. Tsarkov?  A: "Well, I told him I don't know if it's an innocent comment.  It's benign, I don't know.  But I mention it because in conjunction I want to know if the atmosphere at work – would I expect to see this kind of behavior or if this is going to be an escalation of what is happening.").

[7] Elsewhere Wallen states that LaPiana screamed at him in a meeting not in November, but on October 28, 2010, (Wallen Decl. ¶ 190), and Wallen met with

Around November 2010, Wallen reported Tsarkov's comment to Cox, and told

him about the LaPiana incident. (*Id.* 260:21-261:5 (". . . I complained to him about

LaPiana's discriminator[y] and hostile treatment of me, right? And I told him in

combination of what Tsarkov says and all these things . . . ."). Wallen told Cox that he

felt that he was being discriminated against, but did not say on what basis. (Wallen

Dep. 263:24-264:24). According to Cox, Wallen never told him he believed LaPiana's

behavior was racially motivated; Wallen did not tell Cox he was being discriminated

against based on race, color or national origin. (Cox Decl. ¶ 47). Cox did tell Wallen to

speak to Ditinsky, which Wallen did. (*Id.* ¶ 49; Rule 56.1 Stmt. & Resp. ¶ 77).

Thereafter, on November 10, 2010, Wallen sent an email to Cox, stating:

> as for the issue between my counterpart and I, I believe it is a
> NON ISSUE. He now treats me as his stepson. Anatoly
> [Ditinsky] further created the framework to understand the
> personality. We were able to cooperate the way professionals
> do and produce the draft of the document that I think we
> should do. Anatoly [Ditinsky] had to tell us so thanks again
> for your expert advice. Peace, Noel [Wallen].

(Cox Decl., Ex. 12).

Cox then sent an email to Ditinsky, Palmer, and Victoria McGlyn, the chief

financial officer of Teknavo. The email states:

> This matter is closed but Anatoly [Ditinsky] and I want this to
> be documented and kept in the company records. I will
> forward a mail from Noel [Wallen] where his response to my
> follow up, indicates all is now okay. We both felt that Noel
> [Wallen] was being a bit too sensitive but policy dictates that
> we follow up and take action, which we have done. Again, no

---

Ditinsky about both Tsarkov's comment and LaPiana's screaming on October 29, 2010, (Wallen Decl. ¶ 193). He alleges that in between those dates, Wallen met with Cox for the first time, and spoke with Cox as a follow-up in November. (Wallen Decl. ¶¶ 192-4). This is not supported elsewhere in the record. (Wallen Dep. 258:18-20 (Wallen testifying that he spoke to a Bloomberg employee immediately after the incident, prior to meeting with Cox and then Ditinsky "[i]n November.").

> action required but I do want this kept in the personnel records or the company records regarding Noel [Wallen]. Well done, Anatoly [Ditinsky] onhnadling [sic] this and many thanks, regards Tom.

(Cox Decl., Ex. 13).  Wallen alleges that Cox and Ditinsky's response was a "sham investigation" because they did not speak with either LaPiana or Tsarkov.  (Wallen Decl. ¶¶ 17-18).

On March 22, 2011, Wallen and LaPiana disagreed on a work issue during a meeting.  (Wallen Dep. 255:15-258:12, 270:22-271:16).  LaPiana yelled "people of your type are stupid so you should listen."  (*Id.* 255:22-23).  After returning to his desk, Wallen told Ditinsky about the incident.  (*Id.* 272:24-273:11).  Ditinsky convened a meeting with Wallen, LaPiana and other team members.  (*Id.* 273:19-275:16).  The next day, LaPiana sent an email apologizing for his behavior.  The email states:

> Yesterday afternoon and evening I was reflecting on our interaction (mine, with Noel [Wallen] and Oleg [Tsarkov]).  I realized that I had been short-tempered.
>
> This isn't an excuse for my behavior, but an explanation.  I threw out my back on the weekend and I've been in pain ever since.  Because of the pain, I haven't been sleeping.  Together these have made me irritable.
>
> My apologies for any discourtesy and apparent lack of respect.

(Ditinsky Decl., Ex. 3).

On May 23, 2011, Wallen was excluded from a meeting.  Wallen approached Cox the same day to tell him he had been left out of a meeting.  (Cox Dep. 201:14-202:15; Wallen Dep. 223:14-225:10).  During the five to fifteen-minute conversation, Cox told Wallen he did not know about the specific meeting, whether Wallen was supposed to be at the meeting, or the meeting's location.  (Wallen Dep. 224:16-226:17; Cox Dep. 201:14-

202:15).  Cox told Wallen he himself frequently does not get invited to all the meetings

he thinks he should.  (Cox Dep. 202:7-15).  Cox said he did not believe that Wallen

looked stressed or upset, and Cox did not believe there was a need for an investigation.

(*Id.*).  Wallen did not tell Cox that he felt discriminated against or singled out because of

his race or national origin.  (Wallen Dep. 225:20-24).

On June 28, 2011, while at a project status meeting, another incident occurred

between LaPiana and Wallen.  Wallen asked LaPiana for a "specification" about a work

assignment, which "offended" LaPiana.  (Wallen Dep. 288:22-291:2).  LaPiana then

allegedly made "demeaning and condescending remarks" about how Wallen is Jamaican

and lacked programming knowledge, while making hand gestures.  (Wallen Decl. at 72,

¶ (N)(b)).  This allegation—that in June 2011, LaPiana made specific reference to

Wallen's Jamaican background—is inconsistent with Wallen's earlier accounts of the

meeting, and is alleged for the first time during the summary judgment briefing.

Nothing in the Complaint, Wallen's deposition or contemporaneous emails suggests

LaPiana said anything about or gestured towards Wallen's race, color or national origin.

The Complaint (¶ 35) lacks such detail.  The deposition testimony gives no indication of

discriminatory animus.  (Wallen Dep. 289:17-22 ("Mr. LaPiana was working on a

technical component that requires me information on certain specifications and I asked

him for the specification so I could implement the task on my terminal.  And that was

what he felt offended me asking him.")).  Wallen also emailed Cox on July 1 and July 3,

2011 about the incident.  (*Id.* 291:8-9; Cox Decl., Ex. 9 (". . . Nonetheless, a similar

inappropriate behavior occurred last week and I have decided to relate the extent of my

experience to you first before discussing the matter with personnel . . . Tom, I think it is

extremely unprofessional and demeaning for Frank to be shouting at me in a group

meeting.  I was extremely embarrassed.").  The email contains no reference to racist or

discriminatory behavior by LaPiana.  And Wallen's deposition testimony about the

email confirms that.  (Wallen Dep. 299:15-300:3 (Q: "Then you responded to Mr. Cox

on July 3rd at 4:54 and mention that you believe that Mr. LaPiana engaged in

unprofessional and demeaning behavior.  But again, you don't say anything about

discrimination or feeling discriminated against based on your race or national origin or

disability, correct?" . . .  A: "I didn't use that explicit language.")).

     C.  <u>Moving to the 19th Floor</u>

    Wallen states that he suffers from astigmatism which causes difficulty when

reading in dim light, sore eyes, and headaches.  (*Id.* 100:6-105:4).[8]  At some point,

Wallen notified Ditinsky of his astigmatism.  (*Id.* 110:2-23).  Wallen did so again

sometime between December 2010 and February 2011.  (*Id.* 111:18-113:7).  Dr. Theodora

Petratos, who treated Wallen for his eye condition(s), testified that Wallen has

astigmatism.  (Deposition of Dr. Theodora Petratos dated Sept. 29, 2016 ("Petratos

---

[8] Wallen, in his opposition to summary judgment also states he suffers from glaucoma.  (Wallen Br. at 8, 108-09, 111-13).  This is not alleged in the Complaint or mentioned in his deposition.  Aside from one mention of glaucoma in Wallen's Declaration, no evidence exists on the record that Wallen suffered from glaucoma.  (Wallen Decl. ¶ 85 ("[M]y rare eye conditions . . . include astigmatism, glaucoma, nearsightedness, and farsightedness)).  After testifying about his astigmatism (Wallen Dep. 97:25-109:9) and other medical conditions like hypertension (*id.* 126:19-127:11), Wallen stated he had no other health conditions that impacted his work.  (*Id.* 127:12-22) (Q: "Were there any other health conditions that you suffered while you were at Blackrock that made it difficult for you to work there?"  A: "When I started experiencing the harassment, I suffered high degrees of stress."  Q: "Was there anything else, though, that you claim was a disability that you had when you went to work at Blackrock?"  A: "No."); *see also* Dep. of Dr. Sujathja Rajan (undated) ("Rajan Dep.") at 91:6-15 (Q: "So you didn't see any problems with his reaction to light?" A: "Not at that time." Q: "And did he have any eye conditions to your knowledge?" A: "No." Q: "Did he report anything about issues with his eyes that led you to do an eye exam?" A: "It's routine.")).  The Court cannot, therefore, credit Wallen's glaucoma assertion; in any event, it does not affect the Court's resolution of Wallen's ADA claims.

Dep.") 31:17-32:1).  Both Dr. Petratos and Dr. Abraham David Flug, another doctor who

treated Wallen, testified that Wallen's astigmatism was not disabling.  (Petratos Dep.

25:25-26:4; Deposition of Dr. Abraham David Flug dated Dec. 7, 2016 ("Flug Dep.")

18:18-20, 20:4-6).[9]

Before January 2011, Wallen sat by a window due to his astigmatism.  (Wallen

Dep. 110:24-111:12).  In January 2011, Bloomberg moved the OPS team to a block of 8

desks on the 19th floor.  (Ditinsky Decl. ¶ 12, Ex. 1).  The desks were set up in two rows,

with the first by a window and the second adjacent to the first.  (Ditinsky Decl. ¶ 13, Ex.

1).  When the OPS Project team moved to the 19th floor, Wallen initially chose a desk

but was then moved to a desk in a dark passageway.  (Wallen Dep. 131:4-22).  Ditinsky

allegedly told Wallen he had to use the desk in the dark passageway; it is unclear if

Ditinsky or another individual made the decision designating that desk for Wallen.

(Wallen Dep. 133:6-18).  Approximately two to three weeks after sitting at the desk in a

dark passageway, Wallen was either moved by Ditinsky to the desk that he originally

chose next to a window, (Wallen Dep. 131:19-132:3), or Wallen "adamantly told

[Ditinsky] that I will return to my originally selected window seat" and went to the

window location on his own accord.  (Wallen Decl. ¶ 162).

Wallen alleges that his improper desk placement was related to his request that

he work as an independent contractor.  On January 19, 2011, Wallen met with Teknavo's

human resources and benefits coordinator, Cassandra Kinyon, to request that he be

converted from a W-2 employee to a 1099 independent contractor.  (Wallen Decl. ¶ 158).

---

[9] Although they discuss treatments, neither doctor testifies that Wallen had
glaucoma.  (*E.g.*, Petratos Dep. 31:8-10 (Q: "What is brimonidine used to treat again?"
A: "Glaucoma, to lower the pressure in patient's eyes.")).

He also emailed Kinyon about his request, and that email was forwarded to Ditinsky and Cox. (*Id.* ¶ 159). Wallen was given an offer by Teknavo to convert to 1099 status, which he accepted on February 2, 2011. (*Id.* ¶ 161). "Contemporaneously," Ditinsky assigned him a seat in the dark, unlit area of the 19th floor. (*Id.*). Either two weeks after complained about his desk location, (*id.* ¶ 163), or two weeks after he accepted the conversion, (*id.* ¶ 200), Teknavo revoked his independent contractor status via email. (*Id.* ¶¶ 163, 200). The email was sent to him by Kinyon. (*Id.*). Several Russian and white employees were permitted to work as independent contractors. (Wallen Decl. ¶¶ 158, 200).

Wallen was not, by his own admission, discharged because of his disability. (Rule 56.1 Stmt. & Resp. ¶ 103).

### D.  Events Surrounding Wallen's Termination

Cox and Teknavo believed that after the 2011 PO budget was exhausted, a new PO would be issued by Bloomberg for the same amount to continue work. (Rule 56.1 Stmt. & Resp. ¶ 30; Cox Decl. ¶ 19). Teknavo sent Bloomberg billing invoices in the amount of $324,701.60 for each month from January through March 2011, $284,113.90 for April 2011, and $243,526.20 each month from May and June 2011. (Cox Decl. ¶ 27, Ex. 6). In other words, by July 2011, Teknavo had billed $1,745,271.20 on the OPS Project. (*Id.*).

On April 27, 2011, Bloomberg contacted Cox to inform him that the budget for the OPS Project would be coming to an end. (Cox Decl. ¶ 20, Ex. 4). Cox then realized that the budget for the OPS Project would not be extended as he had originally believed, (Cox Decl. ¶ 22, Ex. 4), and although Cox requested additional funding from Bloomberg, the request was denied. (Cox Decl. ¶¶ 23-25, Ex. 4).

Wallen asserts that no reduction in the OPS budget took place. (Rule 56.1 Resp. ¶¶ 30-31). In so doing, he cites to an email dated April 27, 2011 from Cox to Scott Miller, a Bloomberg employee, stating "[another Bloomberg employee] told me that if we need the team we can extend funding and not to worry." (Cox Decl., Ex. 4). Miller replied "I'd like to get a better understanding of what's left to do from the original budgeted plan, what additional work now needs to be done and what realistic additional budget is required (just for the ops project) and how many people are needed (consultants) to do it. Thanks[.]" (*Id.*). Wallen further alleges that because the 2011 PO had a delivery date of December 2011, there was no reason for Teknavo to terminate his employment in July 2011 because the 2011 PO would not have been exhausted. (Rule 56.1 Resp. ¶¶ 32, 33, & 35). Wallen's deposition testimony, however, demonstrates an understanding that the funding could have been reassessed in June. (Wallen Dep. 66:6-67:7 (Q: "Did he tell you whether he expected the project would go on past that first six months?" A: "It was contingent upon a review of the contract at that point, from what I understand[.]")).

Due to the funding reduction, Teknavo devised a plan to reduce the OPS Project budget, including through a workforce reduction of two developers. (Cox Decl. ¶ 26). Cox recommended that of the programmers, Wallen and Tsarkov be discharged because the remaining two programmers had more experience in the financial services sector; Cox had more confidence in their performance. (*Id.* ¶ 30). Palmer reviewed and accepted the recommendation. (*Id.* ¶ 31). Wallen now contends that Cox was the ultimate decisionmaker, (Rule 56.1 Resp. ¶ 38), although that is in tension with his deposition testimony, (Wallen Dep. 302:8-10 (Q: "Do you know who made the decision to terminate your employment?" A: "I have no idea."). In any event, there is no dispute that Cox recommended Wallen and Tsarkov for termination (Cox Decl. ¶ 30). While

there is no evidence as to when that recommendation or decision was made, it was no later than June 28, 2011, because as of that date, Cox was emailing HR personnel to prepare separation agreements for Wallen and Tsarkov. (Cox Decl., Exs. 7-8).

On July 1, 2011 at 9:33 P.M., Wallen sent an email to Cox. Wallen complained about LaPiana's behavior during the June 28, 2011 meeting. In his email Wallen also acknowledged that he had been invited to a meeting on Tuesday, July 5, 2011. (Cox Decl., Ex. 9; Wallen Dep. 297:15-21). That meeting was scheduled for the purpose, Teknavo asserts, of informing Wallen of his termination. (Cox Dep. 149:16-18; Cox Decl. ¶¶ 35-36). In an email response to Wallen on July 2, 2011, Cox told Wallen that he was sorry about the way Wallen felt and stated he would follow up with Ditinsky and LaPiana. (Cox Decl., Ex. 9). On July 3, 2011, Wallen sent another email to Cox regarding LaPiana's conduct. (*Id.*).

On July 5, 2011, Wallen was terminated. (Wallen Dep. 300:8-19). Tsarkov, another developer from the OPS team, was terminated the same day. (Cox Decl., Ex. 11).

IV.    New York State Division of Human Rights ("NYSDHR") Action

Following his termination, Wallen declined to sign a general release in the separation agreement offered by Teknavo. (*Id.* ¶ 42). Wallen filed a complaint with the NYSDHR on November 3, 2011 in which he alleged race, color, national original and disability discrimination and retaliation. (Wallen Dep. 305:2-5). On May 2, 2012, NYSDHR issued a determination dismissing Wallen's complaint for lack of probable

cause. On September 25, 2012, the Equal Employment and Opportunity Commission

adopted the findings of the NYSDHR. (Compl. ¶ 5).[10]

Procedural History

The case was first filed on December 17, 2012.[11] Wallen was previously

represented by several attorneys; he began proceeding *pro se* on June 16, 2016. (Dkt.

No. 117).

Teknavo filed a motion for summary judgment on July 25, 2017. (Dkt No. 140).

The Honorable Margo K. Brodie referred the matter to the undersigned for a report and

recommendation on October 7, 2017.

The Court scheduled oral argument on the motion on the motion for January 25,

2018. (Scheduling Order dated December 1, 2017). Wallen failed to appear. (Order to

Show Cause dated January 25, 2018). The Court issued an order to show cause on

January 25, 2018 for Wallen to explain his nonappearance. (*Id.*). Wallen responded on

---

[10] Teknavo argues that the Court should give substantial weight and deference to
the New York State Division of Human Rights determination dismissing Wallen's
complaint. Teknavo misapprehends the law. Congress, in enacting Title VII, specifically
mandated that the EEOC, "'give substantial weight to final findings and orders *made by
State or local authorities in proceedings commenced under State or Local
[employment discrimination] law*' but imposed no such requirement on federal courts."
*Sloth v. Constellation Brands, Inc.*, 924 F. Supp. 2d 461, 472 (W.D.N.Y. 2013)
(emphasis added) (quoting *Univ. of Tennessee v. Elliott*, 478 U.S. 788, 795-796 (1986)).
There is no statutory or other basis to give any deference or weight to the findings of the
Division of Human Rights, particularly in this summary judgment posture.

[11] The operative Complaint remains the original Complaint filed on December 17,
2012. (*See* Dkt. No. 1). Wallen has been given opportunities to amend his complaint.
He filed a motion to amend the complaint on August 13, 2014. (Dkt. No. 45). The Court
granted leave to amend on August 21, 2014. (Dkt. No. 49). Wallen never did so.
Subsequently, a minute entry directed: "Plaintiff's counsel is to notify the Court no later
than September 15, 2015 as to whether Plaintiff intends to proceed with his motion to
amend the Complaint and, if Plaintiff elects to proceed, the parties are to set a briefing
schedule for the motion." (Minute Entry dated Sept. 1, 2015). On September 15, 2015,
Wallen, through his counsel, declined to amend the Complaint. (Dkt. No. 104).

January 30, 2018, and stated that he had not been informed of the hearing. (Dkt. No. 162). Wallen believed that oral argument was necessary because (1) he believed Teknavo relied on fabricated evidence in its motion; and (2) Wallen wanted argument on the issue of whether Social Security and disability income disqualifies the award of front and back pay. (*Id.*). Teknavo stated it did not believe oral argument was necessary. (Dkt. No. 163).

The Court denies the request for oral argument, and concludes that it is unnecessary to its resolution of the motion. A party has no right to oral argument. "Every circuit to consider the issue has determined that the 'hearing' requirements of . . . Rule 56 do not mean that an oral hearing is necessary, but only require that a party be given the opportunity to present its views to the court." *Greene v. WCI Holdings Corp.*, 136 F.3d 313, 316 (2d Cir. 1998). Both parties have been given ample opportunity to present its views: Wallen filed a 146-page, single-spaced opposition to summary judgment; his Rule 56.1 Response was 42 single-spaced pages; Teknavo was granted to leave to file excess pages in its reply (Dkt. Nos. 138-139), and it filed a supplemental declaration in support of its motion; the parties also submitted hundreds of pages of exhibits and deposition transcripts. The Court has reviewed the record in detail. In any event, the reasons that Wallen proffers are insufficient to reschedule oral argument, after it had already been scheduled. His allegation that certain documents were fraudulent has no merit and is supported by nothing more than a conclusory allegation; in any event, the Court's recommendation is not based on the allegedly fraudulent purchase orders that he identifies, because the Court does not reach the issue of whether his firing was pretextual. As to the issue of front pay and back pay, those issues would

only be relevant if any of Wallen's claims survive summary judgment; none do, and it is unnecessary to reach those issues.

As such, the Court makes its recommendations based on the paper record, as detailed below.

Discussion

I.    <u>Employment Discrimination</u>

The Court first turns to Wallen's Title VII race, color and national origin employment discrimination claim. (Compl. ¶¶ 42-43). Title VII employment discrimination claims employ the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *McDonnell Douglas* and subsequent decisions "established an allocation of the burden of production and an order for the presentation of proof in discriminatory-treatment cases." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000) (quotations omitted). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Under that framework the plaintiff must first demonstrate a *prima facie* case of discrimination. *Id.* The burden at this stage is minimal, but the plaintiff must still "proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive." *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001), *aff'd*, 51 F. App'x 55 (2d Cir. 2002). A plaintiff's self-serving statement, without any direct or circumstantial evidence to support it, does not meet this burden. *Fincher*, 2008 WL 4308126, at *3. "Establishment of the prima facie case

24

in effect creates a presumption that the employer unlawfully discriminated against the employee." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (quotations omitted).

If the plaintiff does present a satisfactory *prima facie* case of discrimination, then the defendant must rebut the presumption by offering "legitimate, non-discriminatory reasons for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254. The defendant's burden at this stage is also minimal. *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998). And "[t]his burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves*, 530 U.S. at 142 (quotations omitted).

If the defendant satisfies this burden of production—by providing evidence to support a nondiscriminatory explanation for the employment action—the presumption created by the *prima facie* case is then rebutted and "drops from the case." *Burdine*, 450 U.S. at 255 n.10. The plaintiff then "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253); *McDonnell Douglas*, 411 U.S. at 802. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence." *Reeves*, 530 U.S. at 143 (quotations omitted). Although the presumption created by the *prima facie* case has been rebutted, at this stage the Court may still consider the evidence supporting the plaintiff's *prima facie* case and "inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Burdine*, 450 U.S. at 255 n.10.

Ultimately, "[i]f the defendant has stated a neutral reason for the adverse action, 'to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)). If the plaintiff cannot do so, the employer will be entitled to summary judgment. *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

A.   <u>*Prima Facie* Case of Discrimination</u>

In a Title VII action alleging race, color or national origin discrimination, the plaintiff must first establish "a *prima facie* case of discrimination [by demonstrating] (1) that he or she is a member of a protected class, (2) that he or she was qualified for the position in question, (3) that he or she suffered an adverse employment action, and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Olle v. Columbia Univ.*, 332 F. Supp. 2d 599, 609 (S.D.N.Y. 2004), *aff'd*, 136 F. App'x 383 (2d Cir. 2005); *accord Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).

1.   <u>Member of a Protected Class</u>

Wallen is a black Jamaican-American male, originally from the West Indies. (Wallen Decl. ¶ 3). Teknavo does not dispute that Wallen is a member of a protected class.

2. Qualified for the Position

Teknavo also does not dispute that Wallen was qualified for the programmer position; having been hired for the position, there can be no material dispute about this element of the *prima facie* test. *See Feingold*, 366 F.3d at 152-53.

3. Adverse Employment Action

An actionable adverse employment action is a "materially adverse change in the terms and conditions of employment," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quotations omitted).

There are two potential adverse employment actions that Wallen's papers identify. The first are the various incidents of unfair treatment, which include his exclusion from meetings related to the OPS Project. The second is his termination in July 2011. Each is addressed in turn.

a. Unfair Treatment

There is no genuine dispute that Wallen was subject to a number of instances of unfair and negative treatment. Wallen could not call into meetings or work from home (Rule 56.1 Stmt. & Resp. ¶ 49(a)); could not come into work late (Rule 56.1 Stmt. & Resp. ¶ 49(b)); had to submit his work in hard copy (Rule 56.1 Stmt. & Resp. ¶ 49(c); Wallen Dep. 159:2-20); was given undesirable assignments in comparison to his Caucasian colleagues (Wallen Dep. 176:6-179:23); was excluded from discussions that took place in Russian (Rule 56.1 Stmt. & Resp. ¶ 49(d)); had limited interaction with Bloomberg employees (Wallen Dep. 198:15-23); was excluded from three to four

meetings (Wallen Dep. 212:25-213:14); was denied opportunities for advancement (Compl. ¶¶ 17-18); had his paycheck delivered to him in an opened envelope (Wallen Dep. 278:3-16); had his tasks allegedly assigned to colleagues with less seniority (Wallen Dep. 283: 18-23); and was not paid a bonus in February 2011 (Wallen Decl. ¶ 201). The Court addresses each of these categories.

Many of these categories, as a matter of law, do not rise to the level of an adverse employment action. Everyday workplace grievances, disappointments, and setbacks do not constitute adverse employment actions. *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x. 206, 211 (2d Cir. 2010) (citing *Galabya*, 202 F.3d at 640).

The first of these items (like coming to work on time or being in the office to work) are basic job requirements and could not, therefore, be adverse employment actions. In any event, the instances when Wallen could not call into meetings or work from home, or could not come to work late, or had to submit work in hard copy, are examples of workplace grievances, at best. *See, e.g.*, *Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 148 (D.D.C. 2010) (denying opportunity to African American employee to telecommute was not an adverse employment action). Even if they were deemed to be job benefits, contrary to his assertions (Rule 56.1 Resp. ¶¶ 49(a)-(c)), Wallen concedes that he either did not seek such accommodations, (Wallen Dep. 149:9-13 ("I never asked him specifically to cancel any meeting for me because I don't think it would happen."), or when he did, his request was granted, (Ditinsky Decl., Ex. 2; Wallen Dep. 154:6-158:16 (. . . Q: "So you were permitted to work from home at that day?" A: "Yes" . . . )). In sum, none of these minor events rise to the level of an adverse employment action. *See, e.g., Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 12 (2d Cir. 2013) (plaintiff's exclusion from alternative work schedule

accommodation did not constitute adverse employment action); *Martinez-Santiago v. Zurich N. Am. Ins. Co.*, No. 07-CV-8676, 2010 WL 184450, at *7 (S.D.N.Y. Jan. 20, 2010) (denial of telecommuting action not adverse action) (collecting cases).

The instances when Wallen was given undesirable and different work assignments is a closer question. Wallen testified at deposition and stated in his declaration that for several months his tasks were confined to operational duties, that he was forced to conduct non-programming activities, and that he was required to report to Pamela Hastings, who was not a OPS team member. *Supra* at 10. Much of this evidence comes from Wallen himself; however, Teknavo does little, if anything, to rebut his testimony. Ditinsky's declaration states only that Wallen's tasks were not outside of his job responsibilities, but he does not deny Wallen's description of what his tasks were, his characterization of them as non-programming, or explain why Wallen was assigned to these tasks. (Ditinsky Decl. ¶ 11 ("[N]one of the assignments given to Plaintiff fell outside the proper scope of the duties of his position.")). Teknavo does not attempt to deny Wallen's recounting of these events; nor does it argue they do not amount to an adverse employment action.

Indeed, they very well could. The Second Circuit has found that "significantly diminished material responsibilities as the sort of employment action sufficiently disadvantageous to constitute an adverse employment action in a Title VII case." *Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007). "[R]eductions in workload and inferior or less desirable assignments constitute adverse employment actions because they impact a plaintiff's opportunity for professional growth and career advancement." *Agard v. New York State Dep't of Taxation & Fin.*, No. 10-CV-4726, 2012 WL 601474, at *7 (E.D.N.Y. Feb. 23, 2012); *see also Wright v. New York City Off-Track Betting Corp.*,

No. 05-CV-9790, 2008 WL 762196, at *4 (S.D.N.Y. Mar. 24, 2008) ("Comparatively poor assignments can constitute adverse employment actions."); *e.g., Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 356 (S.D.N.Y. 2007) (finding plaintiff suffered an adverse employment action where "although she did receive substantive work assignments, many of the tasks assigned to her were inappropriately administrative or secretarial[.]").

Based on his resume, Wallen has a bachelor's degree in applied physics and mathematics and a master's degree in computer science and telecommunications, and 12 years of computer programming experience at the time he was hired by Teknavo. (Dkt. No. 157-5, Wallen Dep., Ex. 2). It is not a stretch that Wallen's reassignments to more operational tasks with little or no programming is potentially a serious professional setback to his computer programming career.

It may be that being assigned non-substantive tasks that fit within one's job description cannot be adverse employment actions. "Where assignments fall within the duties of a plaintiff's position, receiving unfavorable schedules or work assignments does not, without more, rise to the level of an adverse employment action." *Johnson v. Long Island Univ.*, 58 F. Supp. 3d 211, 224 (E.D.N.Y. 2014) (quotations omitted). But Ditinsky's statement that Wallen was never assigned tasks outside of his job description, goes unsupported by any job description, offer letter or other evidence. It is also conclusory, devoid of any specifics, and based on no other record evidence. And even that statement does not explain why Wallen was asked to work for someone not on the OPS team for several months. The Court is left with two competing versions of what Wallen was hired to do, but no genuine dispute about what he in fact did. There is also no dispute that Wallen was hired to work for the OPS Project, (Rule 56.1 Stmt. ¶¶ 18-19),

then assigned to work for someone outside of the OPS team. In light of this, Wallen has procured facts sufficient to identify an adverse employment action.

The allegations and facts about Wallen being excluded from discussions taking place in Russian, having limited or no interaction with Bloomberg employees, and being excluded from three to four meetings provide context for Wallen's case that he suffered an adverse employment action. While any one of these incidents could not itself be an adverse employment action—they nonetheless could be considered by a factfinder to conclude that along with his diminution of substantive tasks, Wallen suffered an adverse action. "[A]n employer's action that does not, standing alone, constitute an adverse employment action may nonetheless contribute to an atmosphere of adverse employment action when accompanied by other actions." *Garvin v. Potter*, 367 F. Supp. 2d 548, 571 (S.D.N.Y. 2005) (quotations omitted); *cf. Collins v. Illinois*, 830 F.2d 692, 704 (7th Cir. 1987) (denial of an office and telephone, although standing alone has never been held to be an adverse action, contributed to an atmosphere of adverse employment action when accompanied by a loss of status, a clouding of job responsibilities, and a diminution in authority).

Other allegations about the unfair treatment Wallen suffered are, however, neither context for the identified adverse action or an adverse action standing alone.

Although Wallen alleges he was denied opportunities for advancement, *supra* at 11-12, this allegation bears no fruit. "[T]he denial of professional training opportunities may constitute an adverse employment action '*only* where an employee can show material harm from the denial, such as a failure to promote or a loss of career advancement opportunities.'" *Johnson*, 58 F. Supp. 3d at 223 (emphasis in original) (quoting *Trachtenberg v. Dept. of Educ. of City of N.Y.*, 937 F. Supp. 2d 460, 468

(S.D.N.Y. 2013)).  Wallen alleges other team members were permitted to test certain APIs and learn other programming languages.  It is not obvious how these actions, whenever they took place, were related to Wallen's purported advancement or promotional opportunities.  Wallen does not identify a promotion he was seeking that he could no longer pursue, projects or assignments he could not complete, or pay or benefits he was denied as a result of not learning Python or testing APIs.  Nor is there any evidence to suggest that testing APIs or learning Python was central to his work on the OPS Project itself.  As a result, the actions labeled as denials of advancement do not constitute an adverse employment action.  *E.g.*, *Sekyere v. City of New York*, No. 05-CV-7192, 2009 WL 773311, at *4 (S.D.N.Y. Mar. 18, 2009) ("Plaintiff does not contend that her position was altered in any way by not receiving some specific training, nor does she contend that she was disciplined, demoted, transferred, or terminated for lack of some fundamental knowledge that should have been provided for her through training.  Accordingly, any failure by Defendants to provide Plaintiff with training does not rise to the level of an adverse employment action.").

The same can be said about Wallen's receiving on a single instance a paycheck in an opened envelope.  No reasonable factfinder could conclude this one act—whatever its meaning—was an adverse employment action.  *See, e.g.*, *Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 435 (E.D.N.Y. 2015) (disrupted papers on desk, missing personal items, and a broken lock to desk drawer could not constitute adverse employment action); *Neratko v. Frank,* 31 F. Supp. 2d 270, 296 (W.D.N.Y. 1998) ("[A] minor personnel matter" without "any materially significant disadvantage" is insufficient to set forth a *prima facie* case; finding issuance of "erroneous paychecks" not actionable).

The remaining two categories of unfair treatment are so devoid of specifics and supporting evidence they too cannot serve as adverse employment actions. Wallen suggests his tasks were assigned to programmers from Russia. But the undisputed evidence demonstrates that Wallen could not identify those tasks, who these programmers were, and whether these individuals were working on entirely different assignments—as opposed to working on Wallen's projects. (Wallen Dep. 284:18-286:2). No adverse action can be gleaned from this unsupported allegation.

As to his claim of being deprived of a bonus, this allegation arises first in his declaration, (Wallen Decl. ¶ 201), does not appear in his deposition testimony, and is conclusory. It, therefore, cannot be credited and cannot serve as an adverse employment action. *See, e.g.*, *McDuffie v. Eli Lilly & Co.*, No. 04-CV-5995, 2009 WL 857069, at *6 (S.D.N.Y. Mar. 31, 2009) ("Although Plaintiff makes conclusory assertions that . . . his bonus was affected by the removal . . . Plaintiff has proffered no specific evidence," and finding no adverse employment action.).

### b. Termination

Wallen's termination is an adverse employment action. *See, e.g.*, *Feingold*, 366 F.3d at 152 ("Examples of materially adverse employment actions include termination of employment[.]").

### 4. Inference of Discrimination

Having identified two adverse employment actions (diminishment of work assignments and job responsibilities, and termination), Wallen must still identify evidence from which a factfinder could infer that they were tinged with discriminatory animus. He cannot do so.

### a. Work Assignments

As to Wallen's job responsibilities and work assignments, it is undisputed that Ditinsky was the OPS Project manager and the one person responsible for devising those assignments and duties. (*Supra* at 7; Cox Decl. ¶ 17; Ditinsky Decl. ¶ 8). But the evidence that Wallen puts forward about discriminatory animus are from his co-workers, not Ditinsky. The racially motivated and derogatory comments—including referring to the intelligence of African-Americans and screaming at Wallen—were made by LaPiana and Tsarkov, Wallen's coworkers. "[C]omments are not evidence of discrimination . . . if they are made by individuals without decision-making authority." *Gorley v. Metro-N. Commuter R.R.*, No. 99-CV-3240, 2000 WL 1876909, at *6 (S.D.N.Y. Dec. 22, 2000), *aff'd*, 29 F. App'x 764 (2d Cir. 2002) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277 (1989)).

Wallen does allege, for the first time in his declaration, that Ditinsky did act with racial animus. (*E.g*., Wallen Decl. ¶¶ 38 ("Cox and Ditinsky were involved in covert racism against me which had harmed me in many ways and such harm has followed me today.")). But there is no evidence from which to draw that inference. The conclusory statements of Wallen are insufficient to create an issue of fact as to whether Ditinsky acted with racial animus. *See, e.g*., *Hayes v. Cablevision Sys. New York City Corp*., No. 07-CV-2438, 2012 WL 1106850, at *9 (E.D.N.Y. Mar. 31, 2012) (granting summary judgment where "plaintiff fails to offer anything but conclusory assertions that [supervisor's actions] were motivated by animus towards his race.").

The question remains whether on the basis of disparate treatment alone, Wallen could potentially establish a *prima facie* case. "A showing that the employer treated a similarly situated employee differently is a common and especially effective method of

establishing a prima facie case of discrimination," and is "one way to discharge that burden." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (quotations omitted). To do so, Wallen must demonstrate that he is "similarly situated in all material respects" to the individuals with whom he seeks to compare himself. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (quotations omitted). What constitutes "all material respects" "must be judged based on [ ] whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards[.]" *Id.* at 40.

"Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Id.* at 39. However, "where a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness*, 263 F.3d at 54; *see also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001) ("This rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."). The standard requires "a reasonably close resemblance of facts and circumstances" and there must be an objectively identifiable basis for comparability. *Graham*, 230 F.3d at 39; *see also McGuinness,* 263 F.3d at 54. When determining whether employees are similarly situated, courts consider characteristics including the employees' education, work experience, and specific work duties. *McPherson v. NYP Holdings, Inc.*, No. 03-CV-4517, 2005 WL 2129172, at *4 (E.D.N.Y. Sept. 1, 2005), *aff'd*, 227 F. App'x 51 (2d Cir. 2007).

Wallen has proffered some evidence that other members of the OPS team—specifically Tsarkov and LaPiana—were similarly situated.[12]  Both of them were, like Wallen, hired to be programmers on the OPS team.  Wallen has a bachelor's degree in applied physics, applied mathematics and operations research from U.W.I. and a master's degree in telecommunications and computer science from Pace University, and a certificate in Project Management from the Institute of Management.  (Wallen Dep., Ex. 2, Dkt. No. 157-5 at 3 (Resume)).  Wallen has approximately 12 years of computer programming experience with three years at financial services companies.  (*Id.* at 3-6).

Tsarkov has bachelor's and master's degrees in applied mathematics and computer science from Nizhny Novgorod State University.  His resume does not provide dates, but states he has 15 years of experience in computer programming with some time at financial services companies.  (Cox Dep., Ex. C, Dkt. No. 157-4 at 34-35).  LaPiana does not list a degree on his resume, and has nine years of experience in computer programming also with some time at financial services companies.  (Cox Dep., Ex. D, Dkt. No. 157-4 at 37-39).  Courts may consider education and years of experience to determine whether employees are similarly situated.  *See, e.g.*, *Pierre v. AngioDynamics, Inc.*, No. 1:12-CV-834, 2013 WL 1292141, at *6 (N.D.N.Y. Mar. 26, 2013).

---

[12] Khupchenko is not similarly situated to Wallen, LaPiana, or Tsarkov, as his job title was "Account Manager," and he also functioned as a human resources representative.  *See* Wallen Decl. ¶ 46 ("[Cox] recommended that Plaintiff and Mr. Tsarkov be discharged and Mr. Lapiana, who was discharged from Credit Suisse for dubious reasons including competency and *Mr. Khupchenko who was an Account manager and temporarily wore the cap of Teknavo HR representative and whose resume speak to a non C++/C programmer and has never contributed to the Analysis effort on the OPS project team.*") (emphasis added).

Even assuming Wallen has demonstrated Tsarkov and LaPiana were similarly situated, Wallen has not put forth admissible evidence from which to conclude they were not also subject to differential treatment. This is because the sum total of the evidence about what Tsarkov or LaPiana were assigned is general testimony from Wallen. Wallen testified that although other team members had to conduct interviews, develop questions and manuals, they did not have to do so consistently. (Wallen Dep. 178:2-4). Other team members were not asked to perform operational tasks with the same frequency, intensity or in some instances at all. (*Id.* 179:11-23; 233:5-10). And the "majority of the time" other team members were doing something "technical regarding programming." (*Id.* 179:17-19).

No evidence is proffered about what assignments or tasks Tsarkov or LaPiana were given, when they were given such assignments, or how their specific assignments differed from Wallen's, if at all. The testimony about other team members might capture Tsarkov or LaPiana, but it may not. This is too thin a reed for summary judgment. "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *W. World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir. 1990) (quotations omitted); *e.g., Fahrenkrug v. Verizon Servs. Corp.,* 652 F. App'x 54, 57 (2d Cir. 2016) (finding no *prima facie* case exists where despite her claims of disparate treatment, plaintiff did not submit any evidence pertaining to her male peers' job duties or assignments); *Fenner v. News Corp.,* No. 09-CV-9832, 2013 WL 6244156, at *19 (S.D.N.Y. Dec. 2, 2013) ("Neither ha[s] Plaintiff[] proffered evidence to support [his] allegations that white employees were given better

assignments.  In sum, Fenner has not raised an inference of discrimination through evidence that he was treated differently from similarly situated white reporters.").

In addition, all of the evidence about the differential treatment comes from Wallen's own testimony.  No other source of evidence is proffered, and the Court, having reviewed the record extensively, cannot discern other support.  Wallen's own testimony cannot create a genuine issue of fact.  *E.g., Newsome v. IDB Capital Corp.*, No. 13-CV-6576, 2016 WL 1254393, at *17 (S.D.N.Y. Mar. 28, 2016) (finding plaintiff failed to make out differential treatment; "[n]one of the circumstances to which he points supports an inference of discrimination because [plaintiff] relies predominantly on his own unsupported testimony to give an invidious cast to neutral work place events.").

      b.    <u>Termination</u>

The same deficiencies are present for the Title VII claim predicated on Wallen's termination.  As noted above, the problematic remarks came from Wallen's co-workers, not his supervisors, or anyone responsible for his termination.  Whatever the basis of Wallen's termination may be, the undisputed evidence is that Cox made a recommendation to terminate Wallen, which may or may not have required final approval from Palmer.  (Cox Decl. ¶ 30-31).  Wallen does not allege Cox made the decision because of, even in part, some animus or discriminatory motive.   There is no evidence from which to infer that Cox's recommendation or decision was the result of discriminatory motive.  *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221-23 (2d Cir. 2004) (holding that plaintiff did not present evidence giving rise to an inference of racial discrimination where he showed a past pattern of racially hostile conduct by co-workers but failed to provide any evidence of bias on the part of the individuals who made the decision to discharge him), *superseded in part on other grounds by* Civil Rights Act of

1991, Pub. L. No. 102-166, 105 Stat. 1071 (amending 42 U.S.C. § 1981); *Grillo v. New York City Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) (dismissing Title VII claim for racial discrimination because plaintiff failed to submit evidence of racial animus on the part of those involved in his termination); *Thermidor v. Beth Israel Med. Ctr.*, 683 F. Supp. 403, 413 (S.D.N.Y. 1988) ("Stark's limited role in the termination process precludes a finding that his racial animus was responsible for Thermidor's discharge.").

And disparate treatment could not be the basis for inferring Wallen's termination was discriminatory, because Tsarkov was terminated at the same time. *See Irons v. Bedford-Stuyvesant Cmty. Legal Servs.*, No. 13-CV-4467, 2015 WL 5692860, at *12 (E.D.N.Y. Sept. 28, 2015) (the proposition that gender discrimination played a role in the termination of a male mechanic is undercut by the fact that female employees were also terminated; *inter alia*, plaintiff could not establish *prima facie* case required) (collecting cases).

Wallen contends that Cox acted with discriminatory intent under the cat's paw theory of liability. (Wallen Br. at 63-70). The theory does not apply. The doctrine applies to those situations where a peer employee fabricates or embellishes allegations against the plaintiff, who is negligently disciplined by the employer on the basis of those allegations. "'[A]n employer can be held liable under Title VII if: the plaintiff's co-worker makes statements maligning the plaintiff, for discriminatory reasons and with the intent to cause the plaintiff's firing; the co-worker's discriminatory acts proximately cause the plaintiff to be fired; and the employer acts negligently by allowing the co-worker's acts to achieve their desired effect though it knows (or reasonably should know) of the discriminatory motivation.'" *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 274 (2d Cir. 2016) (quoting *Velazquez-Perez v. Developers Diversified*

*Realty Corp.*, 753 F.3d 265, 273-74 (1st Cir. 2014)). That is not the case here. Nothing in the record suggests that Cox ever met LaPiana or Tsarkov (until Tsarkov's employment was also terminated). Cox did speak with Ditinsky about the progress of the OPS Project, (Ditinsky Decl. ¶ 9; Cox Dep. 38:19-21), and said he would follow up with Ditinsky and LaPiana about Wallen's complaints, (Cox Decl. Ex. 9 (("I will follow up with Anatoly [Ditinsky] and Frank [LaPiana]".)). But there is no evidence LaPiana said anything to Cox about Wallen or that Cox took into account anything LaPiana said in making the decision to terminate Wallen. The cat's paw theory cannot demonstrate Teknavo acted with discriminatory intent.

Thus, having failed to put forth evidence sufficient to satisfy each of the elements of a *prima facie* case, Wallen's Title VII claim alleging race, color and national origin discrimination should be dismissed.

II.     Hostile Work Environment

To establish a hostile work environment claim under Title VII, a plaintiff must show that "'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000), *superseded on other grounds by* N.Y.C. Local L. No. 85.

There is both a subjective and objective component to a successful hostile work environment claim: a plaintiff must subjectively perceive the environment to be hostile, and the environment must also be objectively abusive. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003); *accord Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310,

318 (2d Cir. 1999) ("A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it."). Whether a reasonable person would have found a work environment hostile depends on all the circumstances, including "(1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance." *Brennan*, 192 F.3d at 319 (citing *Harris*, 510 U.S. at 23).

"Incidents that are few in number and that occur over a short period of time may fail to demonstrate a hostile work environment." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (quotations omitted). But, "[a]t the same time, '[i]t is not how long the . . . innuendos, slurs, verbal assaults, or obnoxious course of conduct lasts. The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive.'" *Id.* (quoting *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 578 (2d Cir. 1989). "While a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" *Id.* at 70 (quoting *Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir. 1997)). The environment need not be "unendurable" or "intolerable." *Id.* Nor must the victim's "psychological well-being" be damaged. *Fitzgerald v. Henderson*, 251 F.3d 345, 358 (2d Cir. 2001). In short, "'the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases.'" *Whidbee*, 223 F.3d at 70 (quoting *Torres*, 116 F.3d at 631).

Therefore, to survive summary judgment, a "plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Whidbee*, 223 F.3d at 69 (quotations omitted).

Wallen was subject to two racial comments from co-workers. On September 9, 2010, Tsarkov told Wallen he was surprised to see an African-American software engineer; he goes on to say that upon encountering African Americans "you cannot help but conclude they are not smart." No denial is offered by Tsarkov or Teknavo. LaPiana several months later—in March 2011—yelled at Wallen, stating "people of your type are so stupid so you should listen." Again no denial is proffered.[13]

Teknavo argues that these are "stray remarks," suggesting that the lack of frequency entitles it to summary judgment. To do so, it relies on the Second Circuit's statement in *Schwapp v. Town of Avon*: "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." 118 F.3d 106, 110 (2d Cir. 1997) (quotations omitted). Teknavo treats frequency as dispositive. It is not. The Second Circuit has cautioned against the overreliance on the language in *Schwapp*. "[T]here is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to

---

[13] The Court cannot credit for the purposes of summary judgment, Wallen's new contention that LaPiana's behavior at a June 28, 2011 meeting was racist or discriminatory. As noted earlier, *supra* at 16, this allegation is in tension with emails, the Complaint, and Wallen's deposition testimony—none of which suggest Wallen believed at the time, or that, in fact, there was a racist or discriminatory component to LaPiana's behavior at the June 28 meeting. In any event, even were the meeting as Wallen now describes it, there still would be no basis for a reasonable jury to conclude that a hostile work environment existed, as explained herein.

liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 439 (2d Cir. 1999) (quotations omitted), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). "[E]ven a single episode of harassment, if severe enough, can establish a hostile work environment." *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 84 (2d Cir. 2009) (quotations omitted). "Ultimately, the question is whether under the circumstances, a reasonable jury could conclude that the harassment [Wallen] suffered is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Torres*, 116 F.3d at 632.

The Court concludes a reasonable jury could not reach such a conclusion. It is beyond dispute that Tsarkov and LaPiana's comments were racist, and explicitly so. There is no difficulty in concluding that these are extremely offensive incidents, specifically targeted at Wallen, the only black member of the OPS team. Both impugn his intelligence, suggest he is incapable of performing his work, and do so on the basis of his race. LaPiana's comments were during a group meeting of the OPS team, (Wallen Dep. 270:22-271:16; Ditinsky Decl. ¶ 19), where Wallen was the only black person present. Wallen was "frozen seated" in his chair until other non-Teknavo employees reprimanded LaPiana for his comment. (Wallen Decl. ¶ 168; Wallen Dep. 272:18-19 ("I was ashamed and I kept quiet. I suppressed my feelings at the time.")).

Ultimately, however, a reasonable jury could not determine, under all of the circumstances, that Wallen's work environment was objectively hostile. The comments are problematic; but at the same time, they were comments from co-workers, not supervisors. They took place some seven months apart. And there is nothing to suggest

that beyond Tsarkov's one comment he engaged in any other discriminatory or offensive conduct or behavior—Wallen certainly does not suggest otherwise. LaPiana's comment is likewise isolated to the single instance over the 11 months of Wallen's employment. And unlike a case where a few isolated comments did constitute a hostile work environment—*e.g.*, *La Grande*, 370 F. App'x at 206—neither of the two comments against Wallen were seized upon or repeated by a supervisor, accompanied by a physical threat or threat of an adverse employment action, or had an identified impact on his work assignments or conditions. *La Grande*, 370 F. App'x at 210; *McPherson*, 2005 WL 2129172 at *8 ("Furthermore, in his hostile work environment claim, McPherson has alleged no instance of physical abuse or public humiliation, factors which might have created a hostile work environment in spite of the relative paucity of alleged racial comments."). Wallen does not identify facts to indicate that these comments interfered with his working conditions; to be sure, he alleges that his working conditions were problematic and he was subject to unfair treatment, but there is nothing to suggest that LaPiana or Tsarkov—as opposed to Ditinksy—was responsible for the assignments and other conditions he identifies. *See supra* at 9-10. That is, someone other than his co-workers who made the comments were responsible for his working conditions, and nothing connects those conditions to the offensive statements. The two comments by LaPiana and Tsarkov are inexcusable; they are not, however, sufficiently severe or pervasive to have created an abusive working environment under Title VII. Teknavo is therefore entitled to summary judgment. *See, e.g.*, *Marvelli v. Chaps Cmty. Health Ctr.*, 193 F. Supp. 2d 636, 652 (E.D.N.Y. 2002) (granting summary judgment on hostile work environment claim where "[plaintiff] points to two allegedly racist comments that [administrator] directed at her. She claims that [administrator] engaged in racial

harassment when he called her 'shortie' and did a 'parody' of African Americans by saying, 'hey, Hommey, I'm down with it.' To the extent that a reasonable jury could conclude that these comments are racist, they are of limited severity."); *Devers v. SNC-Lavalin Generation, Inc.*, No. 12-CV-3747, 2014 WL 4954623, at *4 (E.D.N.Y. Sept. 30, 2014) ("Measured against this standard, the record does not support Wood's hostile work environment claim. Wood personally experienced two types of racial comments during his three months of employment on the job site[.]").

There are two other incidents of mistreatment Wallen suffered: LaPiana's screaming at Wallen in November 2010; and another similar incident in June 2011. LaPiana screamed at Wallen in a November 2010 group meeting, but Wallen admitted in deposition he did not remember the exact words said. (Wallen Dep. 244:7-20). And Cox states that Wallen did not mention that he believed LaPiana's June 2011 behavior to be racially motivated, (Cox Decl. ¶ 47), and nothing suggests that it was like Tsarkov's September 2010 and LaPiana's March 2011 comments. Title VII is not a "general civility code." *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *Missick v. City of New York*, 707 F. Supp. 2d 336, 355 (E.D.N.Y. 2010) ("Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe. They are not intended to promote or enforce civility, gentility or even decency."). As such "[i]t is axiomatic that mistreatment at work . . . through subjection to a hostile environment . . . is actionable under Title VII *only* when it occurs because of an employee's sex, or other protected characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (emphasis added). Consequently, these incidents, do not—either by themselves or in combination with the other two comments—create sufficient evidence to demonstrate the existence of a hostile work environment.

Wallen fails, therefore, to set forth a Title VII discrimination case based on a hostile work environment.

III.    Title VII Retaliation

Wallen alleges that he was retaliated against in violation of Title VII.  This claim is also analyzed under the *McDonnell Douglas* burden-shifting paradigm.  *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).  Title VII's anti-retaliation provision is intended to further the [statute's] "anti-discrimination provision by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees."  *Id.*  (quotations omitted).

To make out a retaliation claim, a plaintiff must show that (1) he participated in a protected activity, (2) the employer knew of his participation, (3) he was subject to an adverse employment action, and (4) there was a causal connection between participation in the protected activity and the adverse employment action.  *Id.* at 164.  In this context, the retaliation must be a "but-for" cause of the adverse employment action, and "[i]t is not enough that retaliation was a substantial or motivating factor in the employer's decision."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90-91 (2d Cir. 2015) (quotations omitted); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).  However, "but-for" causation does not require proof that retaliation was the only cause of the employer's action, "but only that the adverse action would not have occurred in the absence of the retaliatory motive."  *Vega*, 801 F.3d at 91.

A.    Protected Activity

Wallen made four complaints that potentially qualify as protected activity under Title VII: (1) in November 2010 he complained to Cox about both Tsarkov's September 2010 comment and LaPiana screaming at him during a meeting in November 2010; (2)

46

on March 22, 2011, he complained to Ditinsky about LaPiana's comments from that day; (3) on May 23, 2011, he complained to Cox after he was left out of a meeting; and (4) on June 28, 2011, he complained to Cox after LaPiana yelled at him at another meeting.

Teknavo argues that these complaints do not constitute protected activity. To establish that he engaged in protected activity, Wallen "need not establish that the conduct [he] opposed was actually a violation of Title VII, but only that [he] possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute." *Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013) (quotations omitted). An employee is protected if he "report[s] and protest[s] workplace discrimination, whether that discrimination be actual or reasonably perceived." *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000). Informal protests of discrimination, such as "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges" are recognized forms of protected activity. *Id.* at 78-79 (quotations omitted).

However, such informal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII. Generalized complaints about a supervisor's treatment are insufficient. *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011) (affirming district court's holding that plaintiff failed to state a *prima facie* case of retaliation because generalized complaint was not protected activity). "[C]omplaints centered on general allegations of harassment unrelated to race [ ] are not protected activity under Title VII." *Thomas v. iStar Fin.*, 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006) (holding that complaints about supervisor's treatment could not form basis of retaliation claim), *aff'd*, 629 F.3d 276 (2d

Cir. 2010); *see also Ruhling v. Tribune Co.*, No. 04-CV-2430, 2007 WL 28283, at *21 (E.D.N.Y. Jan. 3, 2007) (holding that an internal complaint of favoritism was not protected activity where plaintiff had not framed complaint as involving discriminatory conduct).

Under these standards, the first two complaints—in November 2010 and March 2011 are protected activity. In November 2010, Wallen was complaining about *both* Tsarkov's September remark, and LaPiana's screaming at him earlier that month.[14] (Wallen Dep. 260:21-261:5). Wallen need not have said to Cox something akin to "I am making a Title VII complaint." Tsarkov's comment was racist, and Wallen's complaint about a co-worker's discriminatory behavior is protected activity (even if Wallen's simultaneous complaint about LaPiana's screaming at him was not). The same is true of the March 2011 statements to Ditinsky about LaPiana's comments. In both instances, the comments themselves suggest race, color or national origin discrimination (Tsarkov referring to African Americans; LaPiana referring to "people of your type"). Where the incident evinces on its face some discriminatory conduct, a party's complaint about that incident is protected by Title VII. *Cf. Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 652 (S.D.N.Y. 2015) (general complaint of discrimination is sufficient basis for retaliation claim on the basis of gender where plaintiff stated her supervisor exposed himself to her).[15]

---

[14] Teknavo's brief does not address Wallen's complaining about Tsarkov's remark.

[15] It need not matter that the supervisor subjectively not believe—as Ditinsky avers in his declaration, (Ditinsky Decl. ¶ 22)—the employee is not complaining about discrimination. *Cf. Terveer v. Billington*, 34 F. Supp. 3d 100, 118–19 (D.D.C. 2014) (denying motion to dismiss where although defendant does not believe plaintiff's conduct was Title VII protected activity, the Court independently found that it was). Ditinsky's subjective belief would be relevant to the jury should the claim survive, *see*

The latter two complaints do not constitute protected activity. In May 2011, Wallen complained to Cox about being left out of a meeting; nothing about that suggests Wallen is complaining about race or other prohibited discrimination. The same is true for June 28, 2011 when he tells Cox about LaPiana's behavior at a meeting. No evidence in the record suggests that Wallen was engaging in protected activity on these two occasions. *Supra* at 15-17; *see Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012) ("Complaints centered on general allegations of harassment unrelated to race are not protected activity under Title VII.") (quotations omitted).[16]

B. <u>Employer Knowledge</u>

The parties spend a significant amount of time addressing this second element. Teknavo argues that its employee handbook provides a formal complaint process, and appears to suggest that unless Wallen follows the handbook's procedure, Teknavo could not be expected to know about any complaint. It is unnecessary to address these questions, since Teknavo was on notice of the two instances (November 2010 and March 2011) of protected activity.

---

*Haley v. Kundu*, No. 1:11-CV-265, 2013 WL 4039797, at \*6 (E.D. Tenn. Aug. 7, 2013) (denying plaintiff's motion for judgment as a matter of law because jury could consider that defendants did not believe the conduct arose to protected activity); but it is insufficient given the plainly racial nature and context of the comment to grant summary judgment on this element of Wallen's retaliation claim.

[16] The parties spend significant time discussing the timing of the July 2011 complaint. The undisputed evidence indicates that the decision to fire Wallen was made prior to June 2011. (Cox Decl. ¶¶ 33-34). The July complaint cannot serve as the basis of a retaliation claim because it postdates the adverse action. *See, e.g.*, *Irons*, 2015 WL 5692860, at \*22 (granting summary judgment where the termination decision, although unclear exactly when it was made, was made prior to defendants learning of a sexual harassment complaint).

Nothing more than general corporate knowledge is necessary to satisfy the knowledge element of a *prima facie* retaliation claim. *See, e.g.*, *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000). The November 2010 complaint by Wallen was made directly to Cox, who had responsibility for making recommendations about the hiring and firing employees. (Cox Dep. 93:15-24). The March 2011 complaint was made to Ditinsky, who did not have ultimate decision to hire or fire team members, but was the project's team leader, and worked with Cox on responding to Wallen's other complaints. (Cox Decl. ¶¶ 49-50). Ditinksy and Cox were Teknavo's agents, and their knowledge is imputed back to the corporation for the purpose. *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (plaintiff's complaints to an officer of the company meant "plaintiff was in effect communicating her concerns" to company) (cited with approval by *Tubo v. Orange Reg'l Med. Ctr.*, No. 13-CV-1495, 2015 WL 5945853, at *12 (S.D.N.Y. Oct. 13, 2015), *aff'd*, 690 F. App'x 736 (2d Cir. 2017)).

C. Adverse Employment Action

The adverse employment action that Wallen identifies in his retaliation claim is his termination. Termination is an adverse employment action. *See supra* at 33.[17]

---

[17] Wallen does not allege that his other alleged mistreatment (*e.g.* exclusion from meetings) was retaliation for any of his complaints. At one point in his deposition, Wallen says "after I started making complaints . . . Mr. Ditinsky was not comfortable, apparently, with me doing certain things." (Wallen Dep. 87:21-25). That has never transformed into a claim of retaliation. Wallen was represented by counsel when he was forming his case, and was given multiple opportunities to amend, which he declined. In any event, because Wallen is now *pro se*, the Court has analyzed such a claim, and concludes it would fail. This appears to be the sole support in the record for the claim of retaliation in the form of work assignments, and it is insufficient because it is vague testimony and just Wallen's testimonial allegation. It also cannot survive in light of Wallen's own admission. (Wallen Dep. 266:7-10 (Q: "Did you ever tell Mr. Ditinsky that you felt you were being discriminated against by Mr. LaPiana?" A: "No.")).

D. <u>Causation</u>

A plaintiff may establish the necessary causal connection between the protected activity and an adverse employment action either "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant" or "indirectly, by showing that the protected activity was followed closely by discriminatory treatment," *Gordon*, 232 F.3d at 117 (citing *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993)); *see also DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987).

i.   <u>The November 2010 Complaint</u>

Wallen cannot establish the causal connection directly with respect to the November 2010 complaint.  Cox made the recommendation to terminate Wallen.  There is no evidence proffered or in the record that Cox made the recommendation because of Wallen's November 2010 complaint.  Wallen argues that Cox's proffered reasons for terminating him—the reduction of the Bloomberg budget and the lack of renewal of the OPS Project—make no sense; that may be, but whatever the reason for Wallen's termination, no evidence suggests Cox made the decision in retaliation of Wallen's complaints.  And at this stage, it is Wallen's burden to show evidence of such retaliatory animus.  *Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 523 (S.D.N.Y. 2016) (plaintiff failed to meet burden of showing retaliatory animus as there was no evidence regarding temporal proximity or direct evidence of animus), *aff'd*, 689 F. App'x 670 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 335 (2017), *reh'g denied*, No. 17-5712, 2018 WL 491641 (U.S. Jan. 22, 2018).

Nor can Wallen establish the causal connection indirectly.  "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an

adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (holding transfer one month after employer learned of protected activity "immaterial in light of the fact that [the employer] concededly was contemplating the transfer before it learned of the [protected activity]") (quotations omitted); *see also Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554-55, 555 n.5 (2d Cir. 2001) (collecting cases). However, "[t]here is no bright line rule concerning the temporal proximity required to support a causal inference." *Alleyne v. NAACP Legal Def. & Educ. Fund, Inc.,* No. 14-CV-6675, 2015 WL 6869731, at *10 (E.D.N.Y. Nov. 6, 2015).

Wallen was notified of his termination on July 5, 2011. The decision to terminate him, however, appears to have been at some point prior to June 28, 2011. (Cox Decl. ¶¶ 33-35). Wallen does not offer evidence that the termination decision was made any earlier. Almost eight months pass between the November 2010 complaint and the June 2011 decision to terminate him. This timing is not "very close." Although there is no bright line rule for temporal proximately, here we have a multi-month gap and no other evidence to suggest retaliatory action. No reasonable jury could conclude Wallen was retaliated against in this context. *See, e.g.*, *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 86 (2d Cir. 1990) (holding that the "lack of evidence demonstrating a causal nexus between [plaintiff's] age discrimination complaint and any subsequent action taken towards him" precluded his claim where the only evidence of causation was a three-and-a-half-month lapse between complaint and adverse action); *Rouse v. City of N.Y.*, 08-CV-7419, 2009 WL 1532054, at *12 (S.D.N.Y. June 2, 2009) ("the ten month period . . . stretches the bounds of the time frame that courts have allowed to support an inference

of causation based on temporal proximity."); *Mugavero v. Arms Acres, Inc.*, No. 03-CV-5724, 2009 WL 890063, at *12 (S.D.N.Y. Mar.31, 2009) (collecting cases and noting "three month gap is on the borderline of what courts in this Circuit have typically found sufficient" to establish a *prima facie* case of retaliation).

ii.   The March 2011 Complaint

The March 2011 complaint fails the causation test as well.  The March complaint was made by Wallen to Ditinsky.  And while Ditinsky was responsible for team management, assignments, and direction, only Cox was responsible for hiring and firing decisions to any degree, and Cox made the recommendation or decision to terminate Wallen.  Nothing in the record suggests Cox knew Wallen complained to Ditinsky about what happened in March.  Quite the opposite.  In his deposition when asked who he discussed the March incident with, (Wallen Dep. 275:4-5 ("Did you have any further conversation with anyone about what happened?"), he does not mention Cox.  *See id.* When the decisionmaker taking the adverse action lacks knowledge of the protected activity, the defendant is entitled to summary judgment on causation.  This is true, even if the plaintiff satisfies the third prong of the *prima facie* inquiry by relying on the general corporate knowledge doctrine.  *Weber v. City of New York*, 973 F. Supp. 2d 227, 272 n.25 (E.D.N.Y. 2013) ("Although DOE's corporate knowledge of the filing of the complaint with the State Division of Human Rights was sufficient to meet Plaintiff's *prima facie* burden to establish knowledge, because Defendants have shown that there is no evidence that Robinson, who Plaintiff alleges orchestrated the OEO investigation, knew of the complaint at the time the OEO investigation was initiated, DOE's corporate knowledge fails to demonstrate the necessary causal connection.") (citing *Gordon*, 232 F.3d at 117); *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 859 (S.D.N.Y. 2013)

("*Gordon* makes clear that even where general corporate knowledge may satisfy the second prima facie prong of a retaliation claim (employer's knowledge), the lack of evidence indicating knowledge of particular individual agents can doom a plaintiff's ability to show the fourth element (causation).").

Wallen's Title VII retaliation claim should therefore be dismissed.

IV.    ADA Discrimination

A claim of disability discrimination in violation of the ADA is subject to the *McDonnell Douglas* burden-shifting analysis. *McBridge v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009).

To make out a *prima facie* case under the ADA based on a failure to accommodate, a plaintiff must establish that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer refused to make such accommodations. *McMillan v. City of New York,* 711 F.3d 120, 125-26 (2d Cir. 2013); *Krachenfels v. N. Shore Long Island Jewish Health Sys.*, No. 13-CV-243, 2014 WL 3867560, at *11 (E.D.N.Y. July 29, 2014).

Wallen alleges that he suffers from astigmatism and glaucoma.[18]  Putting aside the question of whether astigmatism is a disability under the ADA,[19] Wallen cannot make out a *prima facie* claim of a failure to accommodate.  That is because he cannot establish that Teknavo refused to make accommodations for his astigmatism.  As such, Teknavo is entitled to summary judgment.

Approximately two to three weeks after sitting at a desk in a dark passageway on the 19th floor, Wallen moved to a window location.  (Wallen Decl. ¶ 162).  There is no evidence that he was ever removed from that location.  And his entire ADA claim is based on his inability to obtain a window location in January 2011.

Where an employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is "plainly reasonable."  *Wernick v. Fed. Reserve Bank of N.Y.,* 91 F.3d 379, 385 (2d Cir. 1996).  A reasonable accommodation is one that "'enable[s] an individual with a disability who is qualified to perform the essential functions of that position . . . [or] to enjoy equal benefits and privileges of employment.'" *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting 29 C.F.R. § 1630.2(o)(1)(ii), (iii)).  The accommodation here is plainly reasonable.  It is exactly what Wallen requested and what was necessary to accommodate his astigmatism.

---

[18] *See supra* nn. 8-9.

[19] A disability under the ADA is: (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment.  29 C.F.R. § 1630.2(g).  A major life activity is an activity that is "central to the life process itself," *Bragdon v. Abbott*, 524 U.S. 624, 638 (1998), and includes such functions as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).

Furthermore, Wallen cannot identify an accommodation not provided by Teknavo. After Wallen was given his requested desk location, he made no additional demands or accommodation requests; nor did he complain that he still lacked sufficient light to complete his work functions, (*see* Wallen Dep. 132:4-25).

The only claim that could possibly exist is one arising out of the two to three-week delay in moving Wallen (or letting Wallen move) to the window desk. To make that claim plausible, however, "a plaintiff is required to provide evidence that the delay was motivated by the employer's discriminatory intent, as opposed to mere negligence." *Logan v. Matveevskii*, 57 F. Supp. 3d 234, 258 (S.D.N.Y. 2014) (collecting cases). Wallen identifies no evidence that the purported delay was motivated by discriminatory intent. He places the failure to accommodate on Ditinsky, (Wallen Decl. ¶ 136), but does not allege or identify evidence that Ditinsky acted with discriminatory intent. To the extent that Wallen is claiming the delay in receiving his accommodation violated the ADA, Teknavo is entitled to summary judgment. *See id.*; *e.g.*, *Powers v. Polygram Holding, Inc.*, 40 F. Supp. 2d 195, 202 (S.D.N.Y. 1999) ("[P]laintiff has adduced absolutely no evidence to show that plaintiff's three-week delay was motivated by an attempt to discriminate against plaintiff because of his mental illness.").

V.     ADA Retaliation

Wallen's ADA retaliation claim is analyzed under the same framework as his Title VII retaliation claim. *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001). To establish a *prima facie* case of retaliation under the ADA, a plaintiff must demonstrate: "(1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff

occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999).

Wallen appears to be alleging that following his complaints about his desk location, *supra* at 18-19, Teknavo took adverse action against him by denying his request that he be an independent contractor. This claim fails for the same reason that Wallen's Title VII retaliation claim does: the absence of causation. Wallen made his complaints about his seat location to Ditinsky. (Wallen Dep. 110:2-23; 111:18-113:7). There is no evidence that the individuals who made the decision about Wallen's independent contractor status, namely Cox, Kinyon, who operated as an HR representative, Palmer, or McGlyn knew that Wallen had made complaints about his disability or requests for accommodation.[20] As a result, Wallen's ADA retaliation claim cannot survive summary judgment. *E.g.*, *Ameti ex rel. United States v. Sikorsky Aircraft Corp.*, No. 3:14-CV-1223, 2018 WL 745899, at *9 (D. Conn. Feb. 6, 2018) (applying *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (holding that where decisionmaker imposes the adverse action but is ignorant of plaintiff's protected activity, decisionmaker must act pursuant to encouragement by a superior (who has direct knowledge of the plaintiff's protected activity) to disfavor the plaintiff).

<u>Conclusion</u>

For the reasons explained above, the Court respectfully recommends that summary judgment be granted in favor of Defendants.

---

[20] Wallen states that Cox and Kinyon were responsible for the decision. (Wallen Decl. ¶¶ 158-163). A series of emails indicate that McGlyn and Palmer were also involved in the decision. (Cox Dep., Exs. Q-R, Dkt. No. 157-4).

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this report. Failure to file objections within the specified time may waive the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate [judge's] report operates as a waiver of any further judicial review of the magistrate [judge's] decision.").

Defendants shall immediately serve a copy of this Report and Recommendation on the Plaintiff and file proof of such service in the record.

_____/s/_____
SANKET J. BULSARA
United States Magistrate Judge

February 22, 2018
Brooklyn, New York