UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

NOEL O. WALLEN,

                              Plaintiff,

                    v.

TEKNAVO GROUP and BLACKROCK
CONSULTING, INC.,

                              Defendants.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
12-CV-6196 (MKB) (SJB)

MARGO K. BRODIE, United States District Judge:

Plaintiff Noel O. Wallen, proceeding *pro se*,[1] commenced the above-captioned action on

December 17, 2012, against Defendants Teknavo Group and Blackrock Consulting, Inc.

(collectively "Teknavo" or "Defendant"),[2] alleging violations of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Americans with Disabilities Act of

1990, 42 U.S.C. § 12101 *et seq.* ("ADA"). (Compl., Docket Entry No. 1.) Plaintiff asserts

claims under Title VII for race, color, and national origin discrimination, hostile work

environment, and retaliation. (*Id.*) Plaintiff also asserts claims under the ADA for disability

discrimination for failure to accommodate and retaliation. (*Id.*) On July 25, 2017, Defendant

moved for summary judgment as to all claims. (Def. Mot. for Summ. J. ("Def. Mot."), Docket

---

[1] Plaintiff has been represented at various times during the course of this litigation,
including at its onset. (*See* Compl. 14, Docket Entry No. 1.)

[2] While Plaintiff sues Teknavo and Blackrock as two different defendants, they are one
and the same. In July of 2014, Blackrock changed its name to Teknavo USA, Inc. (Decl. of Tom
Cox ("Cox Decl.") ¶ 2 n.1, Docket Entry No. 144.) For ease of reference, the Court refers to
Teknavo and Blackrock collectively as "Teknavo" or "Defendant."

Entry No. 140; Def. Mem. in Supp. of Def. Mot. ("Def. Mem."), Docket Entry No. 141.)  On

October 7, 2017, the Court referred Defendant's motion to Magistrate Judge Sanket J. Bulsara

for a report and recommendation.  (Order dated Oct. 7, 2017.)

By report and recommendation dated February 22, 2018 (the "R&R"), Judge Bulsara

recommended that the Court grant Defendant's motion for summary judgment in its entirety.[3]

(R&R, Docket Entry No. 165.)  On March 12, 2018, Plaintiff timely objected to the R&R.  (Pl.

Obj. to R&R ("Pl. Obj."), Docket Entry No. 170.)  On May 17, 2018, Defendant responded to

Plaintiff's objections, and requested that the R&R be adopted in its entirety.  (Def. Resp. to Pl.

Obj. ("Def. Resp."), Docket Entry No. 182.)  For the reasons explained below, the Court grants

in part and denies in part Defendant's motion for summary judgment.

## I.  Background

The Court assumes familiarity with the underlying facts as detailed in the R&R and

provides only a summary of the pertinent facts and procedural background.

### a.  The parties

Plaintiff is a black Jamaican-American male, originally from the West Indies.  (Decl. of

---

[3]  The Court initially entered a Memorandum and Order adopting the R&R in its entirety
on March 12, 2018, finding that no timely objections had been filed by March 9, 2018 by either
party.  (March 2018 Decision, Docket Entry No. 168.)  Defendant had filed a certificate of
service purporting to effectuate service by email and mail on February 23, 2018.  (Defendant
Certificate of Service, Docket Entry No. 166.)  Plaintiff filed objections on March 12, 2018, after
the Clerk of Court had already entered judgment.  The Court subsequently determined that
Defendant had not obtained express consent from Plaintiff for service by electronic means as
required by Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure.  *See Martin v. Deutsche
Bank Sec. Inc.*, 676 F. App'x 27, 29 (2d Cir. 2017) ("[T]he requisite consent 'must be express,
and cannot be implied from conduct.'" (citation omitted)).  As a result, the Court vacated its
March 2018 Decision, finding that Plaintiff had until March 12, 2018, to file objections to the
R&R.  (Order dated April 26, 2018); *see also* Fed. R. Civ. P. 6(d) (adding three days the period a
party may or must act after being served and service is made by mail under Rule 5(b)(2)(C)).

Noel O. Wallen, ("Pl. Decl.") ¶ 3, annexed to Pl. Opp'n to Def. Mot. ("Pl. Opp'n"), Docket Entry

No. 157, as Ex. 1, Docket Entry No. 157-1.)[4]  He has a bachelor's degree in applied physics,

applied mathematics, (*id.* ¶ 4), and a master's degree in telecommunication and computer

science, (*id.* ¶ 5).  Since 1982, Plaintiff has worked as a software engineer.  (*Id.* ¶ 7.)

Teknavo "designs, builds and manages front office technology applications for the

financial services sector."[5]  (Def. Statement of Material Facts Pursuant to Local Rule 56.1 ("Def.

56.1") ¶ 1, Docket Entry No. 142.)  Jay Palmer is the Chief Executive Officer and Chief

Operating Officer, and Victoria McGlyn is the Chief Financial Officer.  (*Id.* ¶¶ 2, 5.)  On or about

May or June of 2010, Teknavo began negotiating with Bloomberg LP to provide software

services "involv[ing] the analysis of Bloomberg product and system flow, methods, components,

---

[4]  Citations to Plaintiff's "Ex." refer to the number of the attachment to Plaintiff's
opposition brief to Defendant's motion for summary judgment.

[5]  The Court disregards Plaintiff's conclusory, unsupported objections to Defendant's
Local Rule 56.1 statements pursuant to the United States District Courts for the Southern and
Eastern Districts of New York.  "Pursuant to Local Rule 56.1, a nonmoving party, in its
opposition to a summary judgment motion, must 'include a correspondingly numbered paragraph
responding to each numbered paragraph in the statement of the moving party . . . [that] must be
followed by citation to evidence which would be admissible' under Federal Rule of Civil
Procedure 56(c).'"  *Herlihy v. City of New York*, 654 F. App'x 40, 43 (2d Cir. 2016) (citation
omitted).  "Accordingly, a nonmoving party may not rely solely on 'allegations in [the] pleading,
or on conclusory statements, or on mere assertions that affidavits supporting the motion are not
credible' to defeat a summary judgment motion."  *Id.* (citation omitted).  The Court thus deems
admitted Defendant's statements to which Plaintiff has failed to properly object or otherwise
provide admissible evidence.  *See Kelly v. City of New York*, 576 F. App'x 22, 24 n.2 (2d Cir.
2014) (finding no error or abuse of discretion where district court deemed admitted 56.1
statements to which defendants only offered "general denials and admissions that did not meet
the substance of plaintiffs allegations").  Due to the conclusory nature of the objections, the
Court relies principally on Plaintiff's deposition testimony, construing the facts in the light most
favorable to Plaintiff, the non-movant.  *See Nguedi v. Fed. Reserve Bank of N.Y.*, No. 16-CV-636,
2019 WL 1083966, at *1 (S.D.N.Y. Mar. 7, 2019) ("[W]here a *pro se* plaintiff fails to submit a
proper Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains
some discretion to consider the substance of the plaintiff's arguments, where actually supported
by evidentiary submissions." (citations omitted)).

and various practices related to the Operations, Product and Sales Group," (the "OPS Project").

(*Id.* ¶ 13.)

Teknavo contracted DTC Consulting and Walden Systems as independent contractors for management purposes on various projects including the OPS Project. (*Id.* ¶¶ 7–8, 20–21.) Tom Cox, the president of DTC Consulting, ensures that Teknavo is "properly organized and staffed to deliver the services promised and that the services are delivered." (*Id.* ¶ 7.) Cox also "set the direction for the OPS Project, but did not interact on a daily basis with members of the [OPS] team." (*Id.* ¶ 21.) Anatoly Ditinsky, an employee of Walden Systems, provided managerial services, and served as "Team Leader and Project Manager of the OPS Project." (*Id.* ¶ 7.) As Team Leader and Project Manager, Ditinsky "helped establish goals . . . , coordinated, facilitated the day-to-day progress . . . , [and] managed expectations . . . of the OPS Team." (*Id.* ¶ 7.) "Neither Ditinsky nor Cox had responsibility for making decisions regarding hiring, firing, promoting, demoting, and/or approving compensation of employees of Teknavo."[6] (*Id.* ¶ 24.) While authorized to "mak[e] recommendations regarding bonus payments, hiring and terminations of the OPS Team members," Cox did not have "ultimate authority to approve such decisions." (*Id.* ¶ 23.)

**b. Plaintiff's hiring**

In early August of 2010, Teknavo hired Plaintiff to be a Senior Programmer Analyst, a position with a base salary of $130,000 and the "added benefit of a yearend discretionary bonus dependent upon performance delivery and management appraisal." (Employment Offer Letter, annexed to Decl. of Jennifer Courtian ("Courtian Decl."), Docket Entry No. 143, as Ex. 8,

---

[6] Plaintiff specifically did not dispute this fact in his response to the Defendant's Rule 56.1 Statement. (*See* Pl. Resp. to Def. 56.1 ("Pl. Resp.") ¶ 24, Docket Entry No. 157-3.)

Docket Entry No. 143-3.)  On September 1, 2010, Plaintiff officially began working for Teknavo on the OPS Project.[7]  (Pl. Decl. ¶ 12.)  Other members of the OPS Team included Yuri Khupchenko, Alexander, Nachayev, Oleg Tsarkov, Frank LaPiana, Michael Keeler, and Constantine Papadopoulos.  (Declaration of Anatoly Ditinsky ("Ditinsky Decl.") ¶ 7, Docket Entry No. 145.)  Plaintiff contends that he, Tsarkov, and LaPiana were the only programmers on the OPS Team.  (Pl. Resp. to Def. 56.1 ("Pl. Resp.") ¶ 36, Docket Entry No. 157-3.)

### c.  Racial discrimination allegations

Plaintiff asserts that during the course of his employment Tsarkov, LaPiana, and Ditinsky, in particular, discriminated against him because of his race.

#### i.  Incidents involving Tsarkov and LaPiana

On September 9, 2010, Tsarkov expressed surprise at meeting an African-American software engineer.[8]  Tsarkov elaborated that "when immigrants first encounter African-Americans, you cannot help but conclude that they are not smart."  (Dep. of Noel O. Wallen ("Pl. Dep.") 238:16–22, Docket Entry No. 164-1.)

---

[7]  Plaintiff asserts that he began working for Defendant unofficially in August of 2010. (Decl. of Noel O. Wallen, ("Pl. Decl.") ¶ 12, annexed to Pl. Opp'n to Def. Mot. ("Pl. Opp'n"), Docket Entry No. 157, as Ex. 1, Docket Entry No. 157-1.)

[8]  The Court disregards Plaintiff's statements in the declaration in opposition to summary judgment that contradict Plaintiff's deposition testimony.  *See Domenech v. Parts Auth., Inc.*, 653 F. App'x 26, 28 (2d Cir. 2016) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." (quoting *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014))); *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997) (disregarding plaintiff's declaration as to an alleged statement made by a decisionmaker during a meeting because plaintiff had testified at his deposition that he "could not remember the points that were covered during the . . . meeting").

In November of 2010,[9] LaPiana screamed at Plaintiff during a meeting. (*Id.* at 244:17–20.) Plaintiff remembers LaPiana questioning his competence and technical ability but does not recall the specific words used. (*Id.* at 245:21–246:21.) He believes LaPiana was attempting to humiliate him by trying "to convey [a] feeling of inferiority." (*Id.* at 245:2–12.) After this incident, contemporaneous emails between Cox and Ditinsky suggest that Plaintiff may have accused LaPiana of racism to Ditinsky but not to Cox. (*See* November 10, 2010 email, annexed to Pl. Opp'n as Ex. 4, Docket Entry No. 157-4.)

Plaintiff first confided about LaPiana's actions to Raquel Schneiderman, a Bloomberg employee, in November of 2010, without expressly stating that he felt discriminated against. (Pl. Dep. at 258:18–259:24, 260:10–12.) Schneiderman recommended that Plaintiff speak to Cox about the incident. (*Id.* at 259:16–18.) Shortly thereafter, Plaintiff complained to Cox about Tsarkov's and LaPiana's comments.[10] Plaintiff told Cox that he felt discriminated against but did not state on what basis. (*Id.* at 264:4–11, 16–24, 267:16–22.) He instead spoke generally about his Jamaican background, and stated that "we don't tolerate those things." (*Id.* at 264:8–11, 266:11–15.) After this conversation, Cox recommended that Plaintiff speak to Ditinsky, and explained that he would be available for a follow-up. (*Id.* at 262:13–25.) Following Cox's advice, Plaintiff spoke to Ditinsky, expressing concern over the manner in which LaPiana talked

---

[9] This incident may have actually occurred on October 28, 2010 rather than in November of 2010. (*See* November 10, 2010 email, annexed to Pl. Opp'n as Ex. 4, Docket Entry No. 157-4.)

[10] Plaintiff states in his declaration that he actually complained to Cox on October 28, 2010. (Pl. Decl. ¶ 18.) Contemporaneous emails also indicate that Plaintiff may have met with Cox and Ditinsky in late October of 2010. (*See* November 10, 2010 email.)

to him.[11]  On November 10, 2010, after his meeting with Ditinsky, Plaintiff sent an email to Cox

explaining that that the incident was now a "NON ISSUE," and that LaPiana treated him like a

"stepson."  Plaintiff concluded the email by thanking Cox for his "expert advice."  (Cox Decl. ¶

52.)

On March 22, 2011, LaPiana screamed at Plaintiff during a meeting over a disagreement

about work.  (*Id.* at 255:15-258:12, 270:22-271:16.)  LaPiana told Plaintiff that "people of your

type are stupid so you should listen," in front of other OPS Team members Khupchenko and

Tsarkov.  (*Id.* at 271:2–10.)  Plaintiff told Ditinsky about LaPiana's remark.  (*Id.* at 273:3–4.)

Ditinsky then convened a meeting with all those present for LaPiana's remark.  (*Id.* at 273:21–

25.)  Because he was "the only black guy there," and wanted to "ke[ep] his cool," Plaintiff did

not say anything during the meeting.  (*Id.* at 274:9–13.)  Ditinsky called off the meeting after "he

realized he wasn't getting anywhere."  (*Id.* at 274:16–21.)  The next day, LaPiana sent an email

to Plaintiff extending in part "apologies for any discourtesy and apparent lack of respect."

(LaPiana email dated March 23, 2011, annexed to Ditinsky Decl. as Ex. 3, Docket Entry No.

145-1.)  Plaintiff did not speak to Cox about the incident until over three months later on July 1,

2011.  (Pl. Dep. at 277:24–278:2.)  He also explained in his deposition that this was the only time

LaPiana ever expressly made a racially derogatory remark.  (*Id.* at 256:11–13.)

On June 28, 2011, LaPiana yelled at Plaintiff about another work related dispute.  (*Id.* at

289:25–290:6.)  Plaintiff had "asked [LaPiana] for [a] specification."  (*Id.* at 289:21–22.)

Seemingly offended, LaPiana in response stated "I'm not giving it to you, what do you want it

for," and was "[y]elling and behaving in a manner."  (*Id.* at 290:2–6.)  In a July 1, 2011 email to

---

[11]  Regarding this incident, Plaintiff testified that he never told Ditinsky that he felt
discriminated against.  (Dep. of Noel O. Wallen ("Pl. Dep.") 266:7–10, Docket Entry No. 164-1.)

Cox about the incident, Plaintiff mentioned LaPiana's unprofessional actions but did not state that there was any discrimination because of his race, national origin, or disability.  (*Id.* at 299:15–300:7.)

### ii.  Incidents involving Ditinsky

Plaintiff asserts that Ditinsky discriminated against him throughout the course of his employment by subjecting him to differential treatment in comparison to his white co-workers.

Tsarkov and LaPiana were permitted to arrive late to work, call in rather than attend meetings in person, and Ditinsky canceled meetings on their behalf.  (Pl. Dep. at 147:9–11.) Plaintiff admits that he never requested to call in to a meeting, and also does not know if Tsarkov and LaPiana had provided any excuses in advance.  (*Id.* at 147:19–148:9, 153:13–15.)  Plaintiff never asked Ditinsky to cancel a meeting "because [he] d[idn't] think it would happen."  Nor had Plaintiff ever told Ditinsky that the regular start time did not work for him.  (*Id.* at 149:9–13, 152:5–7.)  Ditinsky explained to Plaintiff that he allowed Tsarkov and LaPiana to come late to work because they were married.  (*Id.* at 149:11–18.)

Unlike Tsarkov and LaPiana, Ditinsky required Plaintiff to produce his work in hard copy for review by other members of the OPS Team.  (*Id.* at 159:2–13.)  Plaintiff complained to Ditinsky about having to provide hard copies.  (*Id.* at 162:4–6.)  Ditinsky explained that he was the manager and could run the OPS Project in a manner he saw fit.  (*Id.* at 162:6–9.)

Work discussions were at times held in Russian or another foreign language, precluding Plaintiff from learning relevant information for the OPS Project.  (*Id.* at 162:10–14.)  Many of these discussions were in cubicles or the general work space, with one or two exchanges in the conference room.  (*Id.* at 171:3–19.)  Plaintiff did not object to others' use of Russian, (*id.* at 171:20–22), and LaPiana and a few other members of the OPS Project also did not speak the

language, (*id.* at 168:15–22).

Plaintiff was at times given undesirable, non-technical tasks.[12]  In particular, Plaintiff asserts that he was reassigned to Pamela Hastings, a Bloomberg employee, sometime after March 22, 2011, shortly after LaPiana's outburst.  (*Id.* at 89:6–25 (explaining it could have been the day after or couple of days after the March 22, 2011 incident with LaPiana).)  Ditinsky explained to Plaintiff via email that he was to assist Hastings for the foreseeable future.[13]  (*Id.* at 90:4–9.)  The undesirable "operational tasks" included preparing training manuals, interviewing job applicants, "develop[ing] programming questions for [a] Russian programmer," and logging error messages in a spreadsheet.  (*Id.* at 89:3–19, 175:2–23.)  Because he is a computer programmer, Plaintiff contends that he should not have had to do these tasks, and found them undesirable as they constituted a large portion of his daily work.  (*Id.* at 174:19–23, 177:6–17.)  Although everyone did some of these undesirable tasks, Plaintiff claims that other OPS Project members did not have to do as many as him and were doing "something technical regarding programming" the "majority of the time."  (*Id.* at 178:2–9, 179:16–23.)  Plaintiff also admits, however, that he does not know all of the tasks Ditinsky assigned to Tsarkov, LaPiana, and others.  (*Id.* at 179:24–180:11.)

---

[12]  On March 25, 2011, Plaintiff complained to Keeler that the main change in assignment was for him to work "SOLELY [on] the OPC analysis doc."  (Plaintiff email to Keeler dated Mar. 25, 2011, annexed to Pl. Opp'n as Ex. 6, Docket Entry No. 157-6.)  Although perhaps not ideal, (*see id.*), the OPC analysis assignment may have been a technical OPS project, (*see* Pl. Dep. at 188:18–20 ("[Ditinsky] asked me to render my technical opinion and I provided that.")).

[13]  Although the Court accepts for purpose of this decision that the alleged reassignment occurred sometime after March 22, 2011, Plaintiff may have been reassigned to work with Pamela Hastings prior to that date.  On March 9, 2011, Ditinsky emailed Plaintiff that "Pam and Dora" would be working with him starting the following Monday (March 14, 2011).  (Ditinsky email to Plaintiff dated March 9, 2011, Docket Entry No. 157-5.)  Consistent with this evidence, the only reassignment discussed in the Complaint is that of Plaintiff's work to Russian programmers as of May 24, 2011.  (Compl. ¶ 33.)

Plaintiff also asserts that many of his desirable, technical tasks were reassigned to OPS Team members with less seniority and recently arrived Russian programmers. (*Id.* at 283:18–23.) Other than a simulator project, Plaintiff cannot identify any specific, desirable tasks that were reassigned from him to others. (*Id.* at 284:2–7, 285:6–18.) Plaintiff does not know to whom the simulator project was reassigned, or the names, tasks, and project of the Russian programmers. (*Id.* at 285:6–286:2.)

Ditinsky limited Plaintiff's access to Bloomberg employees. Plaintiff believed that meeting with Bloomberg employees from Research & Development was required to complete his work successfully. (*Id.* at 199:5–17.) After directly meeting with Bloomberg employees a few times, Ditinsky "laid down a rule" that Plaintiff could not have such meetings. (*Id.* at 201:5–11.) Plaintiff "d[oesn't] know if [the rule] applied to [him] alone." (*Id.* at 201:14–15.) Ditinsky and Keeler had meetings with Bloomberg employees instead. (*Id.* at 201:16–19.) Keeler would later share his notes with Plaintiff. (*Id.*) Plaintiff also asserts that a white co-worker was allowed to make a presentation to Bloomberg employees on a project he had worked on instead of him. (Pl. Decl. ¶¶ 21, 78–82.)

Ditinsky also excluded Plaintiff a few times from meetings that other OPS Team members were invited to attend. (Pl. Dep. at 212:25–213:14.) For example, on November 29, 2010, Plaintiff was unable to attend a meeting because he was invited during his lunch break. (*Id.* at 218:12–221:25.) Plaintiff asserts that Ditinsky knew he was at lunch, a claim Ditinsky denies. (*Id.*; Ditinsky email to Plaintiff dated November 29, 2010, annexed to Pl. Opp'n as Ex. 5, Docket Entry No. 157-5.) Plaintiff believes Ditinsky excluded him from meetings to make him look "technically incompetent" because that is "the only conclusion [he] [could] come to." (Pl. Dep. at 214:5–19.) After missing the November 29, 2010 meeting, Plaintiff complained to

Ditinsky about the perceived disparate treatment. (*Id.* at 212:3–13.)

On May 23, 2011, Plaintiff was not invited to another meeting. (*Id.* at 223:14–225:10.) Plaintiff immediately complained to Cox, (*id.* at 225:4–10), but did not tell Cox he felt he was being discriminated against, (*id.* at 225:20–226:10).

Plaintiff also accuses Ditinsky of intentionally delaying his access to programming resource for a period of three months. (*Id.* at 136:15–137:19, 137:15–19.) Plaintiff admits that that he has no basis for this allegation other than "speculation." (*Id.* at 139:3 ("I did say it would be speculation.").)

Plaintiff also claims that Ditinsky did not give him the same opportunities as other employees for training, and testing out various software programs. (*Id.* at 234:5–235:19, 236:19–237:24.) As to training, Plaintiff states that he wanted to take the initiative to learn Python and that Ditinsky failed to follow up on promises to provide the desired training. (*Id.* at 237:6–10.) Other than sending Ditinsky and Cox an email as to using his vacation time to get the training, Plaintiff "just left it alone." (*Id.* at 237:11–21.) Cox responded to Plaintiff's email, asking if the training "pertain[ed] to . . . work." (*Id.* at 237:16–24.) As to the software programs, Plaintiff states that "though [he] had the manual and instructions to do it, [he] was never given the opportunity to actually do the real thing." (*Id.* at 234:18–20.) When Plaintiff asked if he could also test the program, Ditinsky stated that Plaintiff's work with Hastings took priority. (*Id.* at 235:19–236:2.)

In October or November of 2010, Ditinsky once delivered to Plaintiff a paycheck in an opened envelope. (*Id.* at 278:3–23.) When Plaintiff questioned him about it, Ditinsky stated that Cassandra Kinyon, a Human Resources representative, gave him the envelope already opened. (*Id.* at 281:6–14.) Kinyon denied leaving the envelope open herself and called Ditinsky about

the matter.  (*Id.* at 282:2–16.)  Plaintiff does not know if any other employees had received a paycheck in an opened envelope, (*id.* at 282:16–20), but finds it self-evident and assumes that Ditinsky wanted to find out how much he was earning.  (*Id.* at 280:21–25 ("His motive was to find out how much I'm earning . . . I don't want to speculate, but to me that's self-explanatory."); Pl. Obj. 17 ("Of note, there is no objective evidence of Ditinsky in the record but he was inquisitive enough to open [Plaintiff's] check and smile then lied that Kinyon had given the envelope opened.").)

Plaintiff did not receive a discretionary bonus in February of 2011, (*id.* at 324:18–24), but believes the Russian programmers received a bonus, although admitting he has no evidence to support his belief, (Pl. Decl. ¶ 201; Pl. Opp'n 72 (explaining denial of access to bonus information by magistrate judge).)[14]  Plaintiff does not know if anyone on the OPS Team received a bonus.  (Pl. Dep. at 324:25–325:3.)

Ditinsky allegedly once stated "I am not feeling you" to Plaintiff.  (Pl. Opp'n 48.) Plaintiff also states that Ditinsky employed an oppressive management style because of his upbringing in a "Stalinist" regime.  (*See, e.g.*, *id.* at 79.)

### d.  Disability discrimination allegations

Plaintiff asserts that he suffers from astigmatism and glaucoma.  (Pl. Dep. at 100:6–105:4.)  He first notified Ditinsky of his "eye problems" at some point before January of 2011. (*Id.* at 110:2–21.)  Prior to January of 2011, Plaintiff sat by a window on the fifth floor due to his eye problems.  (*Id.* at 111:5–17.)  Ditinsky neither approved nor rejected Plaintiff's request to sit

---

[14]  The Russian programmers appear to have received "[r]etention [b]onuses."  (Cox email to Victoria Mcglynn dated February 1, 2011, annexed to Pl. Opp'n as Ex. 4, Docket Entry No. 157-4.)  Plaintiff provides no basis to conclude that these retention bonuses were the same as the performance discretionary bonuses.

next to a window on the fifth floor.  (*Id.*)

In January of 2011, the OPS Project Team moved from the fifth floor to the nineteenth floor.  (Ditinsky Decl. ¶ 12.)  After initially picking his own seat on the nineteenth floor, Plaintiff was moved to a dark area for two to three weeks.  (Pl. Dep. at 130:22–131:22.)  Although Ditinsky informed Plaintiff of the need to move to the dark area, it is unclear who decided the change in seating.  (*Id.* at 133:6–24.)  Bloomberg may have chosen the changed seating.  (*See* Bloomberg email to Ditinsky dated January 26, 2011, annexed to Ditinsky Decl. as Ex. 1, Docket Entry No. 145-1.)  Ditinsky did not offer Plaintiff any explanation other than that he was the manager.  (Pl. Dep. at 133:6–12.)  Without express approval from Ditinsky, Plaintiff returned to his chosen seat.  (*Id.* at 132:4–133:5.)

Around this time, Defendant denied Plaintiff's request to reclassify his employment status from employee to independent contractor.  (Pl. Decl. ¶¶ 162–63.)  On January 19, 2011, Plaintiff met with and also emailed Kinyon to request conversion from a W-2 employee to a 1099 independent contractor.  (*Id.* ¶ 158.)  The email was forwarded to Ditinsky.  (*Id.* ¶ 159.)  On February 2, 2011, Tenavko granted the request and offered to convert Plaintiff to an independent contractor.  (*Id.* ¶ 161.)  Tenavko revoked the offer a few weeks later.  (*Id.* ¶¶ 163, 200.)  Plaintiff perceived the revocation of the offer to be retaliatory conduct based on his request for accommodation for his disability.[15]  Kinyon, a human resource representative, explained by email that "[a]lthough our executive team along with our legal advisors approved and supported" the conversion to independent contractor status, "financial advisors" had raised concerns.  (Kinyon email to Plaintiff dated February 18, 2011, annexed to Pl. Opp'n as Ex. 4, Docket Entry

---

[15]  Plaintiff also appears to assert that the revocation of the offer of independent contractor status was racially discriminatory.  (*See* Pl. Opp'n 14.)

No. 157-4.)  Plaintiff states that Defendant allowed the Russian programmers and others such as Hastings and Ditinsky to be independent contractors.  (Pl. Decl. ¶¶ 158, 200.)

Plaintiff admits that he was not discharged because of his disability.  (Pl. Resp. ¶ 103; Pl. Dep. at 325:25–326:3.)

### e.  Plaintiff's termination

On April 27, 2011, Bloomberg informed Cox that the budget for the OPS Project would be coming to an end.  (April 27, 2011 Email, annexed to Decl. of Tom Cox ("Cox Decl."), Docket Entry No. 144, as Ex. 4, Docket Entry No. 144-1.)  Although Cox requested additional funding, explaining that he had previously been told "not to worry," Bloomberg denied the request.  (Cox Decl. ¶¶ 23–25.)  By May 19, 2011, the OPS Team had worked through two-thirds of its year budget, and Bloomberg reiterated that the OPS Project funding was finite.  (*Id.*)  On June 15, 2011, Bloomberg again reiterated the need to adhere to the budget, and Cox suggested changing "team structure" as a solution.  (*Id.*)

Teknavo decided to terminate two programmers from the OPS Project due to budgetary constraints.  (June 28, 2011 Emails, annexed to Cox Decl. as Exs. 7, 8, Docket Entry No. 144-1.)  After "consult[ing]" Ditinsky, Cox recommended the termination of Plaintiff and Tsarkov because they had less experience in financial services and "[Defendant] had more confidence in the [other programmers'] skills."[16]  (Cox Decl. ¶ 30; Defendant email dated Apr. 23, 2012 to NYSDHR, annexed to Pl. Opp'n as Ex. 4, Docket Entry No. 157-4 (asserting that Plaintiff had been terminated because he had less "development" and "relevant capital markets technology"

---

[16]  Plaintiff himself previously acknowledged that LaPiana, who was retained, was treated more favorably in general *because* of perceived superior market data skills.  (*See* Plaintiff email to Keeler dated March 25, 2011 ("[S]ince [LaPiana] claimed to possess some prior Mkt Data skills he can do almost anything at will.").)

experience); NYSDHR decision dated May 2, 2012, Docket Entry No. 143-4 (finding no pretext

based on reduction in force and relative experience of Plaintiff and LaPiana).) Palmer reviewed

and accepted the recommendation. (*Id.* ¶ 31.) The decision to terminate Plaintiff and Tsarkov

was made sometime before June 28, 2011. (June 28, 2011 Emails.)

On July 5, 2011, Cox informed Plaintiff of his termination in an in-person meeting. (Pl.

Dep. at 300:8–19.) Cox also terminated Tsarkov on the same day. (Tsarkov release form,

annexed to Cox Decl. as Ex. 11, Docket Entry No. 144-1.)

### f. Judge Bulsara's recommendations

Judge Bulsara recommended that the Court grant Defendant's motion for summary

judgment as to all claims. (R&R 1.)

### i. Title VII claims

#### 1. Discrimination claims

Judge Bulsara recommended that the Court dismiss the Title VII discrimination claim

because Plaintiff had failed to establish an inference of discrimination — the fourth and final

element of the prima facie prong of the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973), three-step burden shifting framework. (R&R 33.) The parties only disputed the third

(adverse employment action) and fourth (inference of discrimination) elements of the prima facie

prong.

As to the third element, Judge Bulsara determined that Plaintiff's termination and

"reassignment to . . . operational tasks with little or no programming" were adverse employment

actions within the meaning of Title VII. (*Id.* at 29–30, 33.)

As to Plaintiff's reassignment, Judge Bulsara found the evidence of differential treatment

insufficient to allow for an inference of discrimination for two reasons: (1) the asserted

comparators, aside from Tsarkov and LaPiana, were not similarly situated; and (2) Plaintiff's testimony about the differential treatment was too general and conclusory. (*Id.* at 36–37.) Judge Bulsara also found remarks made by non-decisionmakers and Plaintiff's own conclusory statements of discriminatory animus, without any supporting evidence, insufficient. (*Id.* at 34, 38.)

As to Plaintiff's termination, Judge Bulsara found Plaintiff had failed to even allege that Cox, the decisionmaker, had "made the decision because of, even in part, some animus or discriminatory motive." (*Id.* at 38.) Nor had Plaintiff provided evidence that Cox had been influenced by others' discriminatory animus to support a cat's paw theory of liability. (*Id.* at 40.) Judge Bulsara also discounted the assertion of disparate treatment because Tsarkov, a similarly situated employee outside of Plaintiff's protected groups, had also been terminated at the same time. (*Id.* at 39.) As a result, Judge Bulsara concluded that Plaintiff could not make out a prima facie case of discrimination.

### 2. Hostile work environment claim

Judge Bulsara recommended that the Court dismiss Plaintiff's Title VII hostile environment claim because the incidents of discrimination were neither sufficiently severe nor pervasive to be considered objectively abusive. Although acknowledging that two remarks by Plaintiff's co-workers were "racist" and "extremely offensive," Judge Bulsara found the comments insufficient to withstand summary judgment as they were made by co-workers rather than supervisors, and were isolated incidents. (*Id.* at 43–44.) Judge Bulsara reasoned that the comments were not "seized upon or repeated by a supervisor, accompanied by a physical threat or threat of an adverse employment action, or had an identified impact on [Plaintiff's] work assignments or conditions." (*Id.* at 44.) Judge Bulsara also discounted the other asserted

discriminatory incidents as Plaintiff could not recall the "exact words" used in those cases. (*Id.* at 45.) Based on all the circumstances, Judge Bulsara determined that "a reasonable jury could not determine . . . that [Plaintiff's] work environment was objectively hostile." (*Id.* at 43.)

### 3. Retaliation

Judge Bulsara recommended that the Court dismiss Plaintiff's Title VII retaliation claim because Plaintiff had failed to establish a causal connection between the asserted protected activities and his termination — the fourth and final element of the prima facie prong of the *McDonnell Douglas* framework. (*Id.* at 51.) As an initial matter, Judge Bulsara determined that only two of Plaintiff's four complaints — informal complaints made on November of 2010 and March 22, 2011 — constituted protected activity within the meaning of Title VII.[17] (*Id.* at 47–49.) In addressing the November of 2010 complaint, Judge Bulsara determined that Plaintiff failed to provide either direct evidence of discriminatory animus or indirect evidence in the form of temporal proximity. As to the March 22, 2011 complaint, Judge Bulsara found no causal connection because "nothing in the record" suggested that Cox was aware of the grievance. (*Id.* at 53.) Judge Bulsara therefore recommended that the Court grant summary judgment as to the Title VII retaliation claim.

### ii. ADA claim

### 1. Discrimination

Judge Bulsara recommended that the Court dismiss Plaintiff's ADA discrimination claim

---

[17]   Judge Bulsara found that the other two complaints — informal complaints made on May 23, 2011 and July 1, 2011 — did not sufficiently specify that Plaintiff was "complaining about race or other prohibited discrimination." (R&R at 49.) The Court notes that Judge Bulsara appears to have mistakenly dated the July 1, 2011 complaint as one made on June 28, 2011. Although the incident occurred on June 28, 2011, the complaint was made on July 1, 2011. (*See also* Pl. Obj. to R&R ("Pl. Obj.") 6, Docket Entry No. 170 (noting that there was no complaint made on June 28, 2011).)

because Plaintiff failed to establish a prima facie claim for failure to accommodate. (*Id.* at 55.) As an initial matter, Judge Bulsara found that the evidence only supported that Plaintiff suffered from astigmatism but not glaucoma as asserted. (*Id.* at 17 n.8–9.) Irrespective of Plaintiff's specific ailments, and their statuses as disabilities within the meaning of the ADA, Judge Bulsara determined that Defendant had provided reasonable accommodations in the form of a relocation near a window. (*Id.* at 55.) Judge Bulsara found that Plaintiff had neither identified any other accommodations that Defendant failed to provide nor provided evidence that the delay in the move to a window location was caused by discriminatory intent, as opposed to mere negligence. (*Id.* at 56.)

### 2. Retaliation

Judge Bulsara recommended that the Court dismiss Plaintiff's ADA retaliation claim because Plaintiff failed to establish a causal connection between the requests for accommodation and the denial of independent contractor status. (*Id.* at 57.) Judge Bulsara found no evidence to conclude that Cox, Kinyon, Palmer, or McGlyn, the potential decision-makers of employment status, were aware of Plaintiff's complaints and requests for accommodation. (*Id.*) Accordingly, Judge Bulsara determined that the Court should grant summary judgment as to Plaintiff's ADA claim for lack of causation.

### g. Plaintiff's objections to the R&R

Plaintiff initially filed a sixty-five page objection to the R&R. By order dated May 17, 2018, the Court granted Plaintiff permission to file a ten page, double-spaced reply to Defendant's response to his objections. (Docket Order dated May 17, 2018.) On May 29, 2018, Plaintiff filed a seventeen-page, double-spaced reply, attaching a forty-three page "Affirmation" and sixty-one page "Affidavit of Proof of Tampering." (Pl. Reply to Def. Resp. ("Pl. Reply"),

Docket Entry No. 183; Pl. Affirmation, annexed to Pl. Reply as Ex. 1, Docket Entry No. 183-1;

Pl. Affidavit of Proof of Tampering, annexed to Pl. Reply as Ex. 2, Docket Entry No. 183-2.)

The Court only considers the first ten pages of the reply in light of Plaintiff's disregard of

the specific instructions provided in the March 17, 2018 Order. Despite proceeding *pro se*,

Plaintiff is aware and has previously been advised of the proper procedures for seeking an

extension or modification to the Court's rules and orders. (*See* Pl. Letter dated July 17, 2017,

Docket Entry No. 139 (requesting permission to modify opposition brief to fit the Court's page

limit)); *see also Parker v. DeBuono*, No. 98-CV-5765, 2000 WL 223841, at *1 (S.D.N.Y. Feb.

25, 2000) ("Even though *pro se* litigants are generally offered wider latitude than those

represented by an attorney, they are still required to follow the Federal Rules of Civil Procedure

and direct court orders." (citations omitted)), *aff'd sub nom. Parker v. Com'r DeBuono*, 242 F.3d

366 (2d Cir. 2000). The Court therefore only considers Plaintiff's initial summary judgment

submissions, the record, the original objections to the R&R, and the first ten pages of the reply

objections for purposes of this Memorandum and Order.

### i. Plaintiff's Title VII discrimination/retaliation claims

Plaintiff argues that Judge Bulsara erred in analyzing: (1) the fourth (inference of

discrimination) element of the prima facie prong of *McDonnell Douglas* burden-shifting

framework as to the Title VII discrimination claim; and (2) first (protected activity) and fourth

(inference of retaliation) elements of the prima facie prong for the Title VII retaliation claim.[18]

---

[18] Plaintiff also appears to argue that exclusion from meetings could be considered adverse employment actions for purposes of a Title VII retaliation claim. (*See* Pl. Obj. 63.) Judge Bulsara, however, did not find otherwise. Rather, Judge Bulsara explained that Plaintiff had not asserted a retaliation claim based on exclusion from meetings in his Complaint. (R&R 50 n.17; Compl. ¶¶ 16, 26, 32–33.) As discussed *infra*, the Court, however, considers Plaintiff's retaliation claim based on diminished duties following the March 22, 2011 incident as Judge Bulsara ultimately did in the R&R. (*See* R&R n.17; *see also* Pl. Obj. 5, 10–11, 13–14.)

(Pl. Obj. 17.)

## 1. Protected activity

Plaintiff argues that Judge Bulsara erred in finding that the July 1, 2011 complaint was not a protected activity for purposes of a Title VII retaliation claim. (Pl. Obj. 4–5, 8, 29–30, 37, 52, 59.) Plaintiff also disputes Judge Bulsara's finding that the decision to terminate him had been made on June 28, 2011, prior to his July 1, 2011 complaint. (*Id.* at 4–5, 49, 59.)

## 2. Inference of discrimination/retaliation

Plaintiff argues that Judge Bulsara erred in finding that he failed to establish an inference of discrimination and retaliation as to his Title VII claims. (Pl. Obj. 17.)

Regarding his discrimination claim, Plaintiff argues that Judge Bulsara did not adequately consider the proffered evidence of disparate treatment of similarly situated employees. (*Id.* at 4, 21.) Plaintiff appears to argue both that Judge Bulsara erred in limiting the comparators to Tsarkov and LaPiana, (*id.* at 5, 21), and in finding that there was insufficient evidence of differential treatment, (*id.* at 4, 22, 24). Plaintiff contends that in addition to Tsarkov and LaPiana, Nachayev and the ten Russian programmers should all be considered similarly situated employees, taking into consideration, in particular, their shared skillset, work project, supervisors, and disciplinary policies. (*Id.* at 21.) Compared to these other programmers, Plaintiff asserts that he was treated with much "closer scrutiny," and subject to "repeated interruptions of his work . . . , screening from meetings, humiliations, denied timely programming resources," and burdened with "operational tasks." (*Id.* at 24.)

As to his retaliation claim, Plaintiff argues that Judge Bulsara did not properly consider the timeline of events leading to his termination. (*Id.* at 27, 37–44.) Plaintiff contends that he was required to train ten new Russian employees unlike his white co-workers. (*Id.* at 28.) On

July 1, 2011, Plaintiff complained about having to train the new employees because he believed the work "deprived . . . his personal freedom." (*Id.* at 29.) He was terminated "the next business day." (*Id.*) Plaintiff therefore argues there is sufficient temporal proximity to infer retaliation. (*Id.* at 4, 29.)

Although unclear, Plaintiff also appears to argue that discrimination or retaliation should be inferred from alleged inconsistencies in the rationale for his termination. (*Id.* at 30.) Plaintiff contends that the OPS project began on September 1, 2010, and therefore the project must have been extended in February of 2011. (*Id.*) In addition, Plaintiff asserts that the evidence of the OPS project budget submitted by Defendant, and discussions regarding his termination prior to July 1, 2011, are fraudulent and should not have been relied upon by Judge Bulsara. (*See id.* at 35–37, 48, 51–52, 54.)

### ii. Title VII hostile environment claim

Plaintiff argues that Judge Bulsara erred by not finding the March 22, 2011 incident — LaPiana's racially-charged outburst during a meeting — sufficiently severe to constitute a hostile work environment. (*Id.* at 55–57.) Plaintiff contends that the March 22, 2011 incident was made even more severe because Ditinsky stood up for LaPiana. (*Id.* at 56–57.)

### iii. ADA claims

Plaintiff argues that Judge Bulsara erred by failing to credit his glaucoma condition. (*Id.* at 4.) In addition, Plaintiff appears to argue that Judge Bulsara should have considered Dr. Rajan's deposition testimony for purposes of understanding the "emotion[al] stress and mental anguish" caused by Defendant's actions. (*Id.* at 61.) Plaintiff does not challenge any other aspect of Judge Bulsara's factual findings and legal conclusions as to the ADA claims.

### h. Defendant's responses

Defendant's responses to Plaintiff's objections largely repeat the findings and conclusions of the R&R and request that the Court adopt Judge Bulsara's recommendations in their entirety.[19]  Defendant also requests that the Court ignore new arguments that Plaintiff failed to raise before Judge Bulsara.  (Def. Resp. 7–8.)  In addition, Defendant argues that the deferential clear error standard of review should apply to most of the R&R because Plaintiff's objections are conclusory, general arguments, or merely repeats those already addressed by Judge Bulsara.  (*Id.* at 16.)

## II. Discussion

### a. Standards of review

#### i. Report and recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).  When a party submits a timely objection to a report and recommendation, the district court reviews *de novo* the parts of the report and recommendation

---

[19]  In its responses to Plaintiff's objections to the R&R, Defendant requested that the R&R be adopted in its entirety.  (*See* Def. Resp. 4, 6, 19.)  However, in a footnote, Defendant asserted that it "maintains that Plaintiff's assignment did not fall outside the scope of his position, and, therefore, do[es] not constitute an adverse employment action."  (*Id.* at 6 n.3.)

The Court disregards this contradictory statement.  Defendant did not properly object to Judge Bulsara's finding, and did not request that the Court adopt the R&R only as to the portions to which it did not object.

Defendant's argument is also unpersuasive.  A senior associate at a firm, for example, may have been subject to an "adverse employment action" if she suddenly found herself doing *only* document review.  Even if discovery and document review is within the senior associate's "scope of work," a sudden reassignment to menial tasks alone can be an adverse employment action.  Furthermore, even if other similarly situated associates suffered the same fate, the reasons for the diminished duties may differ for each attorney.  *Cf. Boise v. Boufford*, 121 F. App'x 890, 892 (2d Cir. 2005) (finding no adverse employment action where the evidence did not demonstrate plaintiff had been assigned comparatively worse assignments than his peers).

to which the party objected.  *Id.*; *see also United States v. Romano*, 794 F.3d 317, 340 (2d Cir.

2015).  The district court may adopt those portions of the recommended ruling to which no

timely objections have been made, provided no clear error is apparent from the face of the

record.  *John Hancock Life Ins. Co. v. Neuman*, No. 15-CV-1358, 2015 WL 7459920, at *1

(E.D.N.Y. Nov. 24, 2015).  The clear error standard also applies when a party makes only

conclusory or general objections.  *Benitez v. Parmer*, 654 F. App'x 502, 503–04 (2d Cir. 2016)

(holding "general objection[s] [to be] insufficient to obtain *de novo* review by [a] district court"

(citations omitted)); *see* Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file *specific* written

objections to the [magistrate judge's] proposed findings and recommendations." (emphasis

added)); *see also Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) ("Merely referring the

court to previously filed papers or arguments does not constitute an adequate objection under . . .

Fed. R. Civ. P. 72(b)." (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir.

2002))).

In the Second Circuit, it is also "well-established . . . that a district court generally will

not consider new arguments raised for the first time in objections to a magistrate judge's report

and recommendation that could have been raised before the magistrate but were not."  *Pierre v.

Air Serv Sec.*, No. 14-CV-5915, 2016 WL 5136256, at *11 (E.D.N.Y. Sept. 21, 2016) (citations

omitted), *appeal dismissed sub nom. Pierre v. Airserv Sec.*, No. 16-3370, 2017 WL 4541336 (2d

Cir. Jan. 5, 2017); *see also McEachin v. Walker*, 147 F. App'x 223, 224 (2d Cir. 2005) (holding it

was not an abuse of discretion to ignore evidence submitted after the report and

recommendation); *Walker v. Stinson*, No. 99-CV-0054, 2000 WL 232295, at *2 (2d Cir. 2000)

(holding that "the district court did not abuse its discretion in refusing to consider" a legal

argument that defendants "failed to raise" before the magistrate judge).  However, this "judge-

made rule . . . should not automatically be applied without regard to the circumstances of a particular case." *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 123 (2d Cir. 2015). Courts must ensure that the rule only applies where the litigants themselves are responsible for the waiver of any arguments. *See id.* (finding application of rule improper where district court "unintentionally led [plaintiff] astray" as to the need for certain arguments).

In contrast, district courts should apply *de novo* review to arguments previously raised before the magistrate judge. *See Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011) (holding application of clear error standard to be "not correct"). Although many district courts in this circuit apply clear error to "same" arguments, the Second Circuit has never endorsed this judge-made rule and has recently questioned its viability. *See Moss v. Colvin*, 845 F.3d 516, 520 (2d Cir. 2017) ("[W]e are skeptical that clear error review would be appropriate in this instance, where arguably 'the only way for [petitioner] to raise . . . arguments [on that point] [was] to reiterate them.'" (citation omitted)). "[B]y definition," appeal or "review" involves a "rehash[ing]" of arguments previously asserted. *Brown*, 649 F.3d at 195; *see also* Brian J. Levy, *De Novo Denied: District Courts' Reliance on Camardo is Clear Error*, 82 FORDHAM L. REV. RES 8 GESTAE (2013) (arguing that *de novo* review should be applied to properly raised "same" arguments). *De novo* review therefore applies to non-conclusory, specific objections raising arguments previously made to the magistrate judge.

## ii. Summary judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230

(2d Cir. 2015).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.*  The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b.  Unopposed recommendations

#### i.  ADA claim

Although Plaintiff objects to Judge Bulsara's decision not to credit his contention that he suffers from glaucoma,[20] Judge Bulsara did not rely on that finding in recommending summary judgment as to the ADA claims.  Because Plaintiff fails to object to any factual findings or legal conclusions actually relied upon in recommending summary judgment, the Court reviews the ADA claims recommendations for clear error.  Finding none, the Court adopts Judge Bulsara's

---

[20] Although unclear from the record, Plaintiff may have glaucoma.  (*See* Dep. of Theodora Petratos ("Petratos Dep.") 32:15–18, annexed to Decl. of Jennifer Courtian ("Courtian Decl."), Docket Entry No. 143, as Ex. 6, Docket Entry No. 143-3 ("Looks like the biggest thing they were following him for was the glaucoma and eye pressure.").)  Plaintiff, however, only claimed disability based on his astigmatism in the Complaint.  (*See* Compl. ¶¶ 7, 28.)  Moreover, Plaintiff "chose a window seat because it provided adequate lighting for [his] *astigmatism*, a need he communicated to Ditinsky."  (*Id.* ¶ 28 (emphasis added)); *see also Ariel (UK) Ltd. v. Reuters Grp., PLC*, 277 F. App'x 43, 45 (2d Cir. 2008) ("[A]llegations in the complaint are judicial admissions that bind a party 'throughout the course of the proceeding'" (quoting *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003))).

findings and conclusions as to Plaintiff's ADA discrimination and retaliation claims and dismisses the claims.

### ii. Title VI discrimination and retaliation claim

Similarly, the Court applies clear error to the unchallenged elements of the prima facie prong of the *McDonnell Douglas* burden-shifting framework for the Title VII discrimination and retaliation claims: (1) first three elements (member of a protected class; qualified; adverse employment action) of the discrimination claim; and (2) second and third elements (knowledge of protected activity; adverse employment action) of the retaliation claim.

Having reviewed these recommendations for clear error, and finding none, the Court adopts Judge Bulsara's findings and conclusions as to these elements. For purposes of a Title VII discrimination claim, Plaintiff is a member of protected classes, was qualified for his position, and suffered adverse employment actions of diminished work duties and termination. For purposes of a Title VII retaliation claim, Plaintiff has demonstrated sufficient general corporate knowledge of his complaints for purposes of element two (knowledge of protected activity) and suffered the adverse employment action of termination.

The Court applies *de novo* review to the remaining portions of the R&R, but does not consider arguments based on new evidence not previously submitted to Judge Bulsara. *See Kazolias v. IBEWLU 363*, 806 F.3d 45, 54 (2d Cir. 2015) ("The district court ha[s] discretion to consider evidence that ha[s] not been submitted to the Magistrate Judge." (quoting *Hynes v. Squillance*, 143 F.3d 653, 656 (2d Cir. 1998)); *McEachin*, 147 F. App'x at 224 (holding district court "did not abuse its discretion in refusing to consider the late-submitted letters" following report and recommendation (citing *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40 n.3 (2d Cir. 1990))).

### c. Title VII discrimination claim

Title VII discrimination claims are analyzed under the three-stage, burden-shifting framework established by the Supreme Court in *McDonnell Douglas*. *See Tillery v. New York State Office of Alcoholism & Substance Abuse Servs.*, 739 F. App'x 23, 25 (2d Cir. 2018); *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016). Under the framework, a plaintiff must establish a prima facie case of discrimination. *Tillery*, 739 F. App'x at 25. If the plaintiff meets this "minimal" burden, *Holcomb v. Iona College*, 521 F.3d 130, 139 (2d Cir. 2008), a "temporary presumption" of discrimination arises, and the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for the challenged conduct, *Vega v. Hempstead Union Free School District*, 801 F.3d 72, 84 (2d Cir. 2015) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 307, 311 (2d Cir. 2015)). If the defendant-employer articulates such a reason, the burden shifts back to the plaintiff-employee to show that the defendant-employer's reason was pretext or otherwise "more likely than not based in whole or in part on discrimination." *Tillery*, 739 F. App'x at 25 (citing *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009))).

### i. Plaintiff fails to establish a prima facie case of discrimination

To establish a prima facie case of discrimination, a plaintiff must show that: (1) he is a member of a protected class; (2) he is qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Vega*, 801 F.3d at 83.

The Court only considers whether Plaintiff's termination and diminished responsibilities occurred under circumstances giving rise to an inference of discrimination. Only the third and fourth elements of the framework were originally disputed. The parties now also agree that Plaintiff's termination and diminished responsibilities constitute adverse employment actions.

As discussed earlier, the Court found no clear error as to Judge Bulsara's determination that Plaintiff had failed to adequately establish other forms of adverse actions.

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'" *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. 2018) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). "No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination." *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (citations omitted); *Sanderson v. N.Y. State Elec. & Gas Corp.*, 560 F. App'x 88, 93 (2d Cir. 2014) ("[M]any types of evidence may support an inference of discrimination." (citation omitted)). An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in . . . degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]," *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (citation omitted), or by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group," *Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 20 (2d Cir. 2013) (quoting *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010)). "In determining whether a genuine issue of material fact exists for trial," a court is obliged to "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (internal quotation marks omitted) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)).

## 1. Claim based on alleged diminished duties

Plaintiff contends that discriminatory intent may be demonstrated by Tsarkov's and LaPiana's remarks, and disparate treatment.

### A. Discriminatory remarks

In determining the probative value of a remark, courts consider four factors: "(1) who made the remark . . . ; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark . . . ; and (4) the context in which the remark was made . . . ." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).

Plaintiff relies almost exclusively on remarks by co-workers with little probative value. To demonstrate discriminatory intent, Plaintiff points to racist remarks by Tsarkov and LaPiana, his co-workers, in September 9, 2010 and March 22, 2011 respectively. Although those statements are undoubtedly racist,[21] Plaintiff admits that Ditinsky, as project manager, was the one responsible for his diminished responsibilities. Plaintiff fails to provide evidence that LaPiana or Tsarkov had a role in the decisionmaking process or "considerable influence" over Ditinsky. *See Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 310–11 (E.D.N.Y. 2014), *aff'd*, 594 F. App'x 29 (2d Cir. 2015).

As to Ditinsky's alleged discriminatory motive, Plaintiff only offers speculation in lieu of evidence. Throughout his deposition, Plaintiff admitted that he was "speculating" as to Ditinsky's intent based on the diminished opportunities themselves. (*See, e.g.*, Pl. Dep. at 206:13–25, 214:15–19.) Plaintiff's statements in his declaration also fail to support any inference of discrimination. Rather than relying on evidence, Plaintiff assumes discriminatory

---

[21] *See supra* 5 ("[W]hen immigrants first encounter African Americans, you cannot help but conclude that they are not smart."); *supra* 7 ("[P]eople of your type are stupid so you should listen.").

intent in his declaration.  (*See, e.g.*, Pl. Decl. ¶ 33 ("Ditinsky was relentless in his attempts to marginalize [Plaintiff] to the fringe of the OPS project by his racist action to prevent [Plaintiff] from doing a presentation of his own work . . .  before Bloomberg[]"); *id.* ¶ 38 ("Upon information and belief, Ditinsky promoted and condoned workplace violence and verbal abuse against me through his agent and co-worker LaPiana with the explicit purpose to inflict emotional distress and mental anguish . . . ."); *id.* ¶ 43 ("LaPiana joined the OPS project team with the direct intent to harm me by executing Ditinsky['s] hidden animosity and deep-seated racial bias against me in order to evict me from the OPS project.").)  At times, Plaintiff even relied on his own unsupported beliefs that Ditinsky must be discriminating against him due to Ditinsky's upbringing under "Lenin-Stalin authoritarian ideology."  (Pl. Opp'n 19; Pl. Decl. ¶ 43 ("This was the first sign of the ill-effect of Stalinism").)  These "conclusory statements [and] mere allegations . . . are not enough to defeat a motion for summary judgment."  *Saji*, 724 F. App'x at 17.

## B.  Disparate treatment

Plaintiff contends that other members of the OPS project team, LaPiana and Tsarkov in particular, are similarly situated employees who Ditinsky treated more favorably.  (Pl. Opp'n 18.) Plaintiff asserts that he was given "different and undesirable work assignments and less complex tasks" in comparison to LaPiana and Tsarkov.  (*Id.*)

An inference of discrimination may be established by evidence of "more favorable treatment of employees not in the protected group."  *Saji*, 724 F. App'x at 17 (quoting *Abdu-Brisson*, 239 F.3d at 468).  "To do so, the plaintiff must show that the comparators in question were similarly situated to the plaintiff in all material respects."  *Id.* (citations and internal quotation marks omitted).  "Although the question of whether two individuals were

'similarly situated' for these purposes is often a question for the jury, 'a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.'" *Id.* (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)).

Plaintiff fails to provide any evidence that LaPiana and Tsarkov were treated more favorably, even assuming they are similarly situated employees.[22] Although Plaintiff asserts that LaPiana and Tsarkov were given better assignments, there is no evidence to support his assumptions that they were.[23] Other than conclusory, speculative assertions, Plaintiff fails to provide evidence to compare and contrast the type and scope of work assigned to similarly situated employees. Plaintiff cannot rely solely on conclusory, speculative allegations to withstand summary judgment.[24] *See Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App'x 54, 57

[22] Plaintiff also fails to demonstrate that the programmers other than LaPiana and Tsarkov are similarly situated employees. Khupchenko's primary duties did not involve programming on the OPS Project. (*See* Pl. Decl. ¶ 46.) The tasks and job responsibilities of the Russian Programmers are also unclear. (Pl. Dep. at 285:6–286:2); *see also Campbell v. Nat'l Fuel Gas Distrib. Corp.*, 723 F. App'x 74, 76 (2d Cir. 2018) ("[C]omprator[s] must be similarly situated to the plaintiff in all material respects." (citation omitted)).

[23] Plaintiff based his assumption on "observations" that other members of the OPS team were "doing something technical regarding programming" the "majority" of the time. (Pl. Dep. at 179:17–20.) However, Plaintiff acknowledged during his deposition that he did not know the actual type and scope of work assigned to LaPiana and Tsarkov. (*Id.* at 179:24–11.) Plaintiff also stated that at least some of the work was performed outside the office, beyond his observation. (*See id.* at 179:17–23 ("[T]hey would do it at home or whatever or their desks, it varies.").)

[24] The other proffered disparate treatment evidence, (*see supra* pp. 8–12), fails to "raise an inference of discrimination because they are either (1) purely speculative; (2) unsupported by facts in the record; or (3) factually unrelated" to the decisions to assign work and terminate Plaintiff. *Johnson v. St. Luke's Hosp.*, 307 F. App'x 670, 672–73 (3d Cir. 2009); *Shah v. Gen. Elec. Co.*, 816 F.2d 264, 271 (6th Cir. 1987) (requiring disparate treatment evidence to have "a close enough nexus to the discriminatory acts alleged as a basis for recovery"); *King v. Red Roof Inn*, No. 05-CV-124, 2006 WL 572710, at *7 (W.D. Mich. Mar. 8, 2006) ("[A] plaintiff alleging

(2d Cir. 2016) (finding insufficient disparate treatment evidence where the plaintiff "did not submit any evidence pertaining to her male peers' job duties, assignments, bonuses, or salary increases"). The Court therefore grants Defendant summary judgment as to this Title VII discrimination claim.[25] *See Tolbert v. Smith*, 790 F.3d 427, 437 n.7 (2d Cir. 2015) ("courts must 'carefully distinguish between evidence that allows for a reasonable inference of

---

wrongful termination cannot meet her burden of establishing disparate treatment by pointing to an event unrelated to the termination decision" (citing *Shah*, 816 F.2d at 271)); *see also Godfrey v. Ethan Allen, Inc.*, 113 F.3d 1229 (2d Cir. 1997) ("Stray remarks . . . by decisionmakers *unrelated to the decision process* are rarely given great weight." (emphasis added) (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 543 (3d Cir. 1992))). And although "other allegations of discrimination, even if . . . not independently . . . adverse employment actions, [may] provide 'relevant background evidence' by shedding light on [the d]efendant's motivation," Plaintiff's proffered evidence is insufficient to support an inference of discrimination. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015). The only non-conclusory evidence is (1) Plaintiff's exclusion from a handful of meetings and (2) the requirement that Plaintiff provide his work in hard copy. Plaintiff, however, fails to provide any basis to conclude that this "background evidence" is the product of racial animus other than the reality that he was the only African American employee. *See Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir. 1998) ("It is not infrequent that people who are dismissed are fired by managers who differ from them in some respect . . . . If that fact, without more, could suffice to support the finding of discrimination . . . , it would be hard to imagine a termination that could not be attributed to discrimination."); *Mattison v. Potter*, 515 F. Supp. 2d 356, 374 (W.D.N.Y. 2007) (holding that mere fact that the plaintiff, the only female employee, was harassed by supervisors was "simply too speculative to warrant trial" for hostile environment claim). Consequently, Plaintiff effectively asks this Court to find sufficient a weak inference (that the exclusion from meetings and requirement of hard copy were racially motivated) built upon another weak inference (that these allegedly racially motivated actions shed light on Ditinsky's motivation for reassigning Plaintiff). The Court declines to do so. Even in *Vega*, the "background evidence" was much more closely linked to the adverse employment action than in this action. *See Vega*, 801 F.3d at 89 (holding placement of "University of Puerto Rico" banner outside employee's classroom and attempt to transfer employee to Hispanic principal's school bolstered claim that plaintiff was assigned to larger percentage of Spanish-speaking students because of his ethnicity).

[25] The Court disagrees with the R&R to the extent it suggests that non-conclusory, non-speculative, consistent, uncorroborated, sworn testimony cannot create a genuine issue of fact. (*See* R&R 38); *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998) ("There is nothing in [Rule 56] to suggest that nonmovants' affidavits alone cannot-as a matter of law-suffice to defend against a motion for summary judgment.").

discrimination and evidence that gives rise to mere speculation and conjecture'" (quoting *Bickerstaff*, 196 F.3d at 448)).

## 2. Claim based on termination

### A. Animus of decisionmakers

Plaintiff fails to provide any evidence that Cox, the asserted-decisionmaker and the individual who recommended termination to Palmer, the ultimate-decisionmaker, was motivated by any discriminatory intent.[26]  To the contrary, Plaintiff assumes discriminatory animus based on the adverse employment action itself.  As with Ditinsky, Plaintiff offers only conclusory allegations of Cox's supposed discriminatory intent.  (*See, e.g.*, Pl. Decl. ¶ 29 ("Cox fired Plaintiff both in retaliation for having complained about illegal discrimination and because of Cox's own racial animus[] against me . . . ."); *id.* ¶ 36 ("Cox was aware of Ditinsky's intention to destroy my reputation . . . and to transform the OPS project workforce into homogeneously white Russian Programmers.").)  Plaintiff also fails to provide sufficient evidence that Ditinsky's recommendation to Cox was the product of any discriminatory animus.[27]  Nor does Plaintiff

---

[26]  (Pl. Resp. ¶ 38 ("Plaintiff believe[s] that Cox was the decisionmaker."); (Def. Statement of Material Facts Pursuant to Local Rule 56.1 ("Def. 56.1") ¶ 23, Docket Entry No. 142 (affirming that Cox had responsibility for making recommendations regarding terminations).)

[27]  Plaintiff also claimed that Ditinsky never provided a negative evaluation of his work to Cox until a July 2, 2011 email that was critical of his work performance and demeanor.  (*See* Pl. Opp'n 69; Cox Dep. at 150:5–12; *see also id.* at 152:4–5 ("I would also like to just comment this is not a performance review.").)  That "evaluation," however, was submitted *after* the termination decision and is only relevant in so far as it provides evidence of Ditinsky's alleged overall discriminatory animus and its impact on the decisionmaking process.  In that regard, Plaintiff offers only speculation and evidence of subjective disagreement over the quality of his work, relying on conclusory assertions of his superiority over his co-workers.  (*See* Pl. Opp'n 48–49, 68–69); *Francis v. Hartford Bd. of Educ.*, --- F'App'x ---, ---, 2019 WL 211503, at *2 (2d Cir. Jan. 16, 2019) (holding plaintiff "must provide evidence beyond speculation that the negative evaluations were unsupported").  Although Plaintiff now seeks to attach significance to

provide any evidence to suggest that Cox's decision was somehow influenced by LaPiana or Tsarkov, the only individuals for whom there is evidence of discriminatory animus.[28]  *See Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) ("[A] Title VII plaintiff is entitled to succeed, 'even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the *individual shown to have the impermissible bias played a meaningful role* in the [decisionmaking] process.'" (emphasis added and citations omitted)).

### B.  Disparate treatment

Plaintiff offers no additional evidence of disparate treatment specific to his termination. Any argument of disparate treatment for his termination is also undercut by the contemporaneous termination of Tsarkov, a similarly situated employee not within Plaintiff's protected classes. *See Martinez v. N.Y.C. Transit Auth.*, 672 F. App'x 68, 70 (2d Cir. 2016) (explaining "lack of disparate impact on older employees strongly suggests that age was not a factor in [p]laintiffs'

---

Ditinisky's failure to mention the March 22, 2011 incident in his letter, he himself acknowledged that Ditinisky may not have been aware of the incident (at least its full extent).  (*See* Pl. Resp. ¶ 87.)  Plaintiff also admittedly refused to speak at the meeting immediately following the incident, causing Ditinsky to cancel the meeting.  (*See id.* ¶ 87; Pl. Dep. at 274:9–21; *see also supra* n.24 (describing why Plaintiff's other proffered evidence is insufficient).)  Without more, the failure to mention the March 22, 2011 incident is not probative, and little more than speculation.

[28]  The Court departs slightly from Judge Bulsara's analysis in the R&R regarding the cat's paw theory of liability discussion.  The cat's paw theory is applicable to co-workers, immediate supervisors, and other subordinates that influence the decisionmaker. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011); *Nagle v. Marron,* 663 F.3d 100, 117–18 (2d Cir. 2011). Judge Bulsara found the cat's paw theory inapplicable because there was no indication that Cox had taken account of anything LaPiana or Tsarkov had said or believed in terminating Plaintiff. The cat's paw theory, however, applies to an employer's negligent adoption of any of its subordinates' discriminatory motive.  *See Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) (adopting cat's paw theory for Title VII retaliation claims).  Moreover, "longstanding precedent" in the Second Circuit in the "employment-discrimination context" allows imputation to the employer any improper motive of any individual having a "meaningful role" in the decisionmaking process.  *See id.*  The Court therefore considers Ditinsky's influence on Cox's decisionmaking, and Cox's influence on Palmer's final decision.

termination" in assessing ADEA claim); *McDonnell v. Schindler Elevator Corp.*, 618 F. App'x 697, 700 (2d Cir. 2015) (finding disability disparate treatment evidence to be "undermin[ed]" because other recently laid off workers included similarly situated employees who were not disabled)); *see also Martinez*, 672 F. App'x at 71 (holding work "redistribut[ion] among existing employees" precluded inference of discrimination based on theory that plaintiffs were "replace[d]" by employees from non-protected classes).

The Court therefore grants Defendant summary judgment as to the Title VII termination discrimination claim based on Plaintiff's failure to establish a prima facie case of discrimination.

In the alternative, this termination claim also fails because of Plaintiff's failure to provide sufficient evidence of pretext. The Court thus examines below Defendant's legitimate non-discriminatory reason for termination and Plaintiff's evidence of pretext.

### ii. Legitimate non-discriminatory reason

Defendant has also asserted a legitimate non-discriminatory reason for terminating Plaintiff.[29] Cox recommended Plaintiff's termination because of newly realized budgetary constraints. Cox asserts that Plaintiff and Tsarkov were chosen for termination because the retained programmers "had more experience in the financial services business sector, [and Defendant] had more confidence in their skills for the OPS Project." (Cox Decl. ¶ 30.) One of the two retained programmers also performed other necessary functions. (*Id.* ¶ 31.) Plaintiff

---

[29] Defendant did not provide a legitimate non-discriminatory reason for the adverse employment action of diminished duties. Ditinsky once explained to Plaintiff that all work was assigned "solely based on projected time of delivery and efficiency." (Ditinsky email to Plaintiff dated March 9, 2011.) Defendant, however, only argued that there was no adverse employment action because all of the duties assigned Plaintiff were within the scope of his employment. The Court cannot therefore credit any legitimate, non-discreiminatory rationale for any diminishment in duties. *See Russell v. Aid to Developmentally Disabled, Inc.*, --- F. App'x ---, ---, 2018 WL 5098819, at *2 (2d Cir. Oct. 18, 2018) (holding that employer bears the burden of production of legitimate non-discriminatory business rationale).

also concedes that Defendant has satisfied its burden of production. (*See* Pl. Obj. 9 ("In [Defendant's] defense, Cox articulated a legitimate non-discriminatory business reason that the [OPS] budget severely cut which necessitated laying off [Plaintiff] and Tsarkov and not LaPiana even though he was the least qualified and experience[d] programmer . . . .")); Pl. Opp'n 105 ("[Defendant] has articulated at least three legitimate reasons . . . .").)

### iii. Pretext

Plaintiff argues that Defendant's legitimate business rationale is pretext for discrimination for the following reasons: (1) the reasons for his termination have varied over time; (2) he had more relevant experience than LaPiana and his work performance was good; (3) Tsarkov was not actually terminated; and (4) the purchase orders are falsified in light of an alleged discrepancy between the amount allocated to the project and Defendant's invoices and also references to "HAZMAT," "AU," and a "stabilization project."[30] (Pl. Opp'n. 16, 27, 29, 37–38, 50, 52, 57, 69-70, 92–98.)

Plaintiff fails to demonstrate pretext. First, Defendant's reasons for terminating Plaintiff have not been materially inconsistent. Plaintiff argues that Defendant claimed to terminate him for the following "different reasons:" (1) restructuring; (2) general reduction-in-force; and (3) severe budget cut. (*Id.* at 92.) All three reasons are consistent with one another and are explained by budgetary constraints. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 852 (2d Cir. 2013) ("Where the employer offers "variations . . . on the same theme rather than separate inconsistent justifications," there is not sufficient evidence of pretext to preclude the entry of summary judgment.").

---

[30] Plaintiff also asserted a few reasons that are plainly meritless: (1) that he did not receive a warning prior to being laid off; and (2) that he was not the last one hired. (Pl. Opp'n 26–27.)

Second, Plaintiff only provides evidence of subjective disagreement with the opinion of his employer regarding his work experience and performance. *See Francis v. Hartford Bd. of Educ.*, --- F'App'x ---, ---, 2019 WL 211503, at *2 (2d Cir. Jan. 16, 2019) ("[Plaintiff] must provide evidence beyond speculation that the negative evaluations were unsupported." (citing *Zann Kawn*, 737 F.3d at 852)); *Zann Kwan*, 737 F.3d at 852 (Parker, J.) (concurring in part and dissenting in part) (explaining that an employee's "subjective disagreement with her employer's assessment of her performance . . . [is] [in]sufficient to demonstrate [discriminatory] intent and defeat summary judgment." (citing *Ricks v. Conde Nast Pub'ns*, 6 F. App'x 74, 78 (2d Cir. 2001)). Defendant never claimed that Plaintiff was terminated for "poor" performance. Cox instead only asserted that Defendant had greater confidence in LaPiana. In that regard, Plaintiff himself admitted that Ditinsky favored LaPiana's work product over his own, and that LaPiana was treated more favorably due to perceived superior market data skills. (*See* Pl. Dep. at 189:10-11 ("[Ditinsky] would ignore [Plaintiff's suggestions] . . . most of the time in lieu of what [LaPiana] ha[d] to say."); Plaintiff email to Keeler dated Mar. 25, 2011, annexed to Pl. Opp'n as Ex. 6, Docket Entry No. 157-6); *Toussaint v. NY Dialysis Servs., Inc.*, 706 F. App'x 44, 45 (2d Cir. 2017) ("[W]e are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what *motivated* the employer." (quoting *McPherson v. NYC Dep't of Educ.*, 457 F.3d 211 216 (2d Cir. 2006))).

Third, Defendant provided sufficient evidence of Tsarkov's termination. Although Plaintiff argues that Defendant only provided a 2011 W-2 form in response to his request for proof of Tsarkov's termination, (Pl. Opp'n 97), Defendant provided a signed copy of Tsarkov's release form. (*See* Tsarkov release form.) Plaintiff provides no evidence to discredit this submission.

Finally, Plaintiff fails to provide any evidence to suggest that the purchase orders were falsified. Plaintiff first argues that Defendant's invoices from 2010 to 2012 exceed the allocations in the 2011 and 2012 purchase orders. (Pl. Opp'n 100.) Plaintiff thus claims that there were more funds available than Defendant claims. Plaintiff, however, misreads Defendant's representation of the 2011 and 2012 purchase orders to make this argument. (*See* Pl. Opp'n 99 (quoting Defendant's discovery submission letter incorrectly as representing that the purchase orders covered the period from 2010 to 2012)).) Defendant had specifically explained that the purchase orders reflected the agreed upon budget "from 2011 through 2012." Considering the proper period in time, Defendant's invoices match up exactly with the amounts allocated in the 2011 and 2012 purchase orders.[31] (*See* 2011 Purchase Order, annexed to Cox Decl. as Ex. 3, Docket Entry No. 144-1; 2012 Purchase Order, annexed to Cox Decl. as Ex. 5, Docket Entry No. 144-1; Invoices, annexed to Cox Decl. as Ex. 6, Docket Entry No. 144-1.) Plaintiff's other argument that the purchase orders are for projects other than OPS is sheer speculation insufficient to preclude summary judgment.[32]

---

[31] Plaintiff also appears to argue that Defendant should have provided information or a purchase order covering September through December of 2010. (Pl. Opp'n 37; Pl. Decl. ¶ 49.) Any constraints in the 2011 budget, however, would have necessitated a reduction-in-force. Plaintiff fails to rebut the constraints caused by the reduced budget in 2011.

[32] There is no evidence to support Plaintiff's claims of pretext based on other alleged instances of fabrication of evidence. (*See, e.g.*, Pl. Opp'n 107.) Plaintiff, for example, claims that Defendant falsified an employee handbook based on the introduction of a version with the last page signed and a generic blank version at his deposition. (*See* Pl. Dep. at 8–10.) Similarly, Plaintiff argues that Cox and Ditinsky colluded to distort the contents of a report regarding his November of 2010 complaint. (Pl. Decl. ¶ 17.) Cox had asked Ditinsky to note that Plaintiff had not claimed racism in his meeting with him. (November 10, 2010 email.) Plaintiff provides no evidence to suggest that Cox's request was anything more than an actual recollection of the meeting. Moreover, Plaintiff himself admitted that he had not told Cox on what basis he felt discriminated against. (*See* Pl. Dep. at 264:4–11.) Likewise, there is no substance to Plaintiff's allegations that Judge Bulsara, his clerk, and the clerk of court conspired to fabricate evidence or prevent Plaintiff from filing his objections on time.

The Court therefore dismisses both Title VII discrimination claims due to Plaintiff's failure to meet his prima facie burden. The Court also dismisses the termination claim for lack of pretext even if Plaintiff could have satisfied his initial burden.

### f. Title VII retaliation claims

Title VII retaliation claims are also "evaluate[d] . . . using the three-step framework outlined in *McDonnell Douglas*." *Russell v. N.Y. Univ.*, 739 F. App'x 28, 32 (2d Cir. 2018) (citing *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018)). Under the framework, the plaintiff must first establish "a *prima facie* case of retaliation." *Id.* (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)). If the plaintiff sustains this initial "*de miminis*" burden, *Duplan*, 888 F.3d at 626, a "presumption of retaliation" arises and the defendant must "articulate a legitimate, non-retaliatory reason for the adverse employment action," *Saji*, 724 F. App'x at 14 (quoting *Hicks*, 593 F.3d at 164). "If the defendant does so, then the burden shifts back to the plaintiff . . . [to] show that the reason offered by the employer is merely pretext, and that the employer's 'desire to retaliate' was the actual 'but-for cause of the challenged employment action.'" *Id.* (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015)). "'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Duplan*, 888 F.3d at 625 (quoting *Vega*, 801 F.3d at 90–91).

### i. Plaintiff fails to establish a prima facie case of retaliation for his termination

To establish a prima facie case of retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.

2005)).

The parties dispute only the first and fourth elements of a prima facie case of retaliation. Even as to the "protective activities" element, the parties at this stage only dispute whether the July 1, 2011 complaint about LaPiana's outburst on June 28, 2011 qualifies.[33]

Having reviewed Judge Bulsara's findings as to the unopposed portions of the Title VII termination retaliation claim, and finding no clear error, the Court conducts *de novo* review as to whether the July of 2011 complaint qualifies as a protected activity. The Court also conducts *de novo* review as to whether there is a causal connection between any of the qualifying protected activities and Plaintiff's termination.

### 1. Protected activity

Filing either a formal or informal complaint challenging discrimination is a protected activity for purposes of retaliation claims under Title VII. *See Jagmohan v. Long Island R. Co.*, 622 F. App'x 61, 63 (2d Cir. 2015); *Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013). "A complaint of discrimination constitutes 'protected activity' only if (1) the plaintiff holds a good-faith belief that he suffered discrimination because of a protected characteristic and (2) that belief is reasonable." *Jagmohan*, 622 F. App'x at 64–65 (citing *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)); *Summa*, 708 F.3d at 126 (holding that Title VII "protects employees [who] . . . make[] informal protests of discrimination, including making complaints to management, so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law" (alterations in original) (quoting *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001))). Complaints also cannot be so

---

[33] Defendant no longer disputes that Plaintiff engaged in protected activity in making informal complaints on November of 2010 and March 22, 2011. (*See generally* Def. Resp.)

vague or "generalized that the employer could not 'reasonably have understood [ ] that the plaintiff's complaint was directed at conduct prohibited by Title VII.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011) (alteration and citation omitted); *see also Galdieri-Ambrosini*, 136 F.3d at 292 ("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII.").

Plaintiff's July 1, 2011 complaint is not a protected activity because it post-dates the termination decision. The evidence demonstrates that the decision to terminate Plaintiff was made in June of 2011 or earlier. (June 28, 2011 Emails.) Prior to the July 1, 2011 complaint, Cox had already recommended that Plaintiff be terminated. (*Id.*; Cox Decl. ¶¶ 31–35.) Defendant was therefore in the later procedural stages of termination. Plaintiff offers no rebuttal evidence other than his conclusory assertions that there could have been no decision to terminate him because he continued to be employed for a few days. That fact, however, does not negate the evidence that Defendant had already decided to terminate Plaintiff. Complaints made after this "pre-planned" termination decision cannot be the basis of a retaliation claim. *See Douyon v. N.Y.C. Dep't of Educ.*, 665 F. App'x 54, 58 (2d Cir. 2016) (holding that pre-planned decision for termination could not serve as protected activity for Title VII retaliation purposes).

The May 23, 2011 complaint also does not qualify as a protected activity because there is no evidence to suggest that Plaintiff raised concerns about discrimination. Plaintiff admitted that he did not tell Cox that he felt he was being discriminated against. (Pl. Dep. at 225:20–24.)

As a result, only the November of 2010 complaint to Cox about Tsarkov's September 2010 comment and LaPiana's screaming, and the March 22, 2011 complaint to Ditinsky about

LaPiana's comments on that day qualify as protected activities.[34]

## 2. Inference of retaliation

A causal connection of retaliation can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory actions directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 307, 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). "Direct evidence may . . . include evidence of discriminatory statements or actions by employees who, while not the ultimate decisionmakers, have 'enormous influence in the decision-making process.'" *Emmanuel v. Cushman & Wakefield, Inc.*, No. 13-CV-2894, 2015 WL 5036970, at *4 (S.D.N.Y. Aug. 26, 2015) (quoting *Rose v. N.Y.C. Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001)); *see also Knox v. Town of Se.*, No. 11-CV-8763, 2014 WL 1285654, at *13 (S.D.N.Y. Mar. 31, 2014) ("In determining whether a remark is probative, courts consider four factors: (i) who made the remark . . . ; (ii) when the remark was made in relation to the employment decision at issue; (iii) the content of the remark . . . ; and (iv) the context in which the remark was made . . . ."), *aff'd*, 599 F. App'x 411 (2d Cir. 2015). Indirect evidence may include a "showing that the protected activity was closely followed in time by the adverse action." *Colon v. Fashion Inst. of Tech.*, 983 F. Supp. 2d 277, 287 (S.D.N.Y. 2013) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)); *see also, e.g.*, *Feingold v. New York*, 366 F.3d 138, 156–157 (2d Cir. 2004) ("[T]he requirement that [the plaintiff] show a causal connection between his complaints and his

---

[34] Other than the dispute over the July 1, 2011 complaint, the parties did not object to Judge Bulsara's findings that these four complaints are the only potential basis for Plaintiff's retaliation claim. The Court finds no clear error as to that determination.

termination is satisfied by the temporal proximity between the two." (collecting cases));

*Nonnenmann v. City of New York*, No. 02-CV-10131, 2004 WL 1119648, at *22 (S.D.N.Y. May

20, 2004) ("Causation can be established either indirectly by means of circumstantial evidence,

for example, by showing that the protected activity was followed by adverse treatment in

employment, or directly by evidence of retaliatory animus." (quoting *Morris v. Lindau*, 196 F.3d

102, 110 (2d Cir. 1999))).

      Plaintiff fails to provide more than a scintilla of evidence of retaliatory animus.  There is

no evidence to suggest that Cox recommended termination based on the November of 2010

complaint.  Plaintiff also cannot establish causation through temporal proximity as the

termination occurred seven to eight months after the November of 2010 complaint.  *See Abrams

v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (explaining "temporal proximity must

be very close" in Title VII retaliation cases to demonstrate a causal connection); *Caddick v. Pers.

Co. I LLC*, No. 16-CV-7326, 2018 WL 3222520, at *8 (S.D.N.Y. June 29, 2018) ("[C]ourts in

this Circuit have consistently held that the passage of two to three months between the protected

activity and the adverse employment action does not allow for an inference of causation."

(citation omitted)).

      Likewise, Plaintiff offers no evidence to rebut the assertion that Cox, the decisionmaker,

based the termination decision on the March 22, 2011 complaint or was even aware that Plaintiff

made the complaint.  (*See* Pl. Resp. ¶ 87 (explaining in sub-section regarding March 22, 2011

incident that "[i]t is quite possible that neither Ditinsky heard about it nor Cox has any

knowledge of the incident")); *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 34 (E.D.N.Y.

2015) ("[W]here it is undisputed that the decision maker was unaware of the employee's

protected activity, that fact may be evidence that there is no causal connection." (first citing

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011); then citing

*Gordon*, 232 F.3d at 114; then citing *E.E.O.C. v. Bloomberg LP*, 967 F. Supp. 2d 816, 859

(S.D.N.Y. 2013)); *see also Summa*, 708 F.3d at 127 ("To the extent that decisionmaker

knowledge is relevant in establishing causation, that knowledge may be satisfied by

demonstrating that 'the agent who decides to impose the adverse action but is ignorant of the

plaintiff's protected activity *acts pursuant to encouragement by a superior* (who has knowledge)

to disfavor the plaintiff.'" (quoting *Henry*, 616 F.3d at 148)).  Nor did Plaintiff provide any

evidence of retaliatory animus on the part of Ditinsky that influenced Cox's decision.[35]  *Cf.*

*Vasquez*, 835 F.3d at 272 (finding cat's paw theory to apply where co-worker "manipulate[d]"

decisionmakers into serving as "conduit[s]" of his retaliatory animus); *see also Berrie v. Bd. of*

*Educ. of Port Chester-Rye Union Free Sch. Dist.*, 750 F. App'x 41, 49 (2d Cir. 2018)

("Temporal proximity alone is generally insufficient after about three months.").[36]

The Court therefore grants Defendant's summary judgment motion as to Plaintiff's Title

VII termination retaliation claim.  Moreover, this claim would also fail at the pretext stage for the

same reasons discussed for the Title VII discrimination termination claim.

### ii. The Court construes Plaintiff as having alleged a Title VII retaliation claim based on diminished duties following March 22, 2011

The Court considers Plaintiff's Title VII retaliation claim based on a diminishment of

duties following Plaintiff's complaint to Ditinsky on March 22, 2011.  On March 22, 2011,

Plaintiff complained to Ditinsky about an incident that day where LaPiana screamed at him

---

[35]  *See supra* nn. 18, 24, 27.

[36]  Conceivably, there may be temporal proximity because Cox recommended Plaintiff's termination sometime before June 28, 2011, potentially within three months of March 22, 2011. Even then, however, "temporal proximity [alone] is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext." *Francis*, --- F. App'x at ---, 2019 WL 211503, at *2 (citation omitted)).

during a meeting, stating that "people of your type are stupid so you should listen." (Pl. Dep. at 271:2–10.)

Although this claim is not clearly alleged in the Complaint, Plaintiff testified during his deposition about being reassigned to Hastings shortly after the March 22, 2011 incident involving LaPiana.[37] *See DiMare Homestead, Inc. v. Alphas Co. of N.Y.*, 547 F. App'x 68, 70 (2d Cir. 2013) ("[A] district court may consider claims outside those raised in the pleadings so long as doing so does not cause prejudice." (citation omitted)). Judge Bulsara also ultimately considered this claim, considering Plaintiff's *pro se* status. (R&R 50 n.17.) Defendant did not object to Judge Bulsara's consideration of this claim. (*See generally* Def. Resp.) Nor did Defendant provide specific evidence of prejudice caused by the consideration of this claim.[38] Under these circumstances, the Court finds it prudent to consider this claim rather than waiting to do so after granting leave to amend. *See Dimare*, 547 F. App'x at 70 (explaining prejudice precluding leave to amend requires that the "failure to plead an issue . . . disadvantaged" the other party from "presenting its case"); *McNeill v. Jordan*, No. 14-CV-2872, 2017 WL 2955763, at *7 (E.D.N.Y. July 11, 2017) ("[A] district court . . . may grant a *pro se* litigant leave to amend, after the close of discovery and during the pendency of a summary judgment motion." (citations omitted)).

In contrast to the R&R, the Court concludes that Plaintiff has provided sufficient evidence to preclude summary judgment. At the very least, temporal proximity exists between Plaintiff's complaint to Ditinsky about LaPiana's racial comments on March 22, 2011, and the

---

[37] Plaintiff's deposition took place on September 12, 2013.

[38] Defendant, in fact, has only argued the merits of this claim. (*See* Def. Reply in Supp. of Def. Mot., at 18, 23–24, Docket Entry No. 153.)

reassignment to Hastings shortly thereafter.[39] *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII."). Although the R&R concluded that this claim also failed on the merits, the citation to Plaintiff's deposition testimony is unpersuasive. The R&R cited to an exchange where Plaintiff explained that he had never told Ditinsky that he was being discriminated against by LaPiana. (R&R at 50 n.17.) Read in context, this exchange, however, concerned the incident involving LaPiana from November of 2010. (*See* Pl. Dep. at 263:14 – 266:23.) A contrary reading of this testimony, in fact, would conflict with the R&R's own conclusion that Plaintiff had engaged in protected activity by complaining to Ditinsky about LaPiana's conduct about the March 22, 2011 incident. (*See* R&R at 48 (explaining the "March 2011" complaint was a protected activity).) Because Defendant fails to provide any legitimate, non-retaliatory rationale for the alleged reassignment to Hastings, (*see supra* nn. 19, 29), the Court finds that summary judgment is inappropriate for this claim.

### g. Title VII hostile work environment claim

Plaintiff asserts a claim for hostile work environment, relying principally on alleged discriminatory actions by Tsarkov and LaPiana: (1) Tsarkov's remark on September 9, 2010; (2) LaPiana's screaming in November of 2010; (3) LaPiana's remark in March of 2011; and (4)

---

[39] Defendant also fails to provide any persuasive argument why a *significant* diminishment of duties could not constitute an adverse employment action for retaliation claims as Judge Bulsara found they were for discrimination claims. *See Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (defining adverse employment actions as any that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination" in the context of Title VII retaliation (quoting *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)); *Burlington*, 548 U.S. at 71 ("Whether a particular reassignment [of job duties] is materially adverse depends upon the circumstances of the particular case."); (*see also supra* n.19; R&R 28.)

LaPiana's actions on June 28, 2011.  (Pl. Opp'n 116, 121–22.)

"[T]o establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that 'the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Tillery*, 739 F. App'x at 27 (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010)); *see also Boonmalert v. City of New York*, 721 F. App'x 29, 33 (2d Cir. 2018) (holding conduct must be both objectively severe or pervasive and subjectively perceived to be abusive).  Under the totality of the circumstances, a plaintiff must show "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment."  *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)) (internal quotation marks omitted); *Littlejohn*, 795 F.3d at 321 ("[W]e must consider . . . 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993))).  "A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class."  *Tillery*, 739 F. App'x at 27 (quoting *Brennan v. Metro Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999)).

In all cases, there must also be "a specific basis for imputing the conduct creating the hostile work environment to the employer."  *Summa*, 708 F.3d at 124 (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)).  "If the alleged harasser supervises the plaintiff, the objectionable conduct is imputed to the employer."  *Willis v. City of Onondaga*, 710 F. App'x 47,

48 (2d Cir. 2018) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). In those

cases, the employer may assert an affirmative defense by establishing (1) "that the employer

exercised reasonable care to prevent and correct promptly any . . . harassing behavior" and (2)

"that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective

opportunities provided by the employer or to avoid harm otherwise." *Id.* (citation omitted). "If

the alleged harasser is a coworker, the plaintiff must show that the employer 'either provided no

reasonable avenue for complaint or knew of the harassment but did nothing about it.'" *Id.*

(quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000)).

Based on the totality of the circumstances, the Court concludes that summary judgment is

inappropriate at this time for the hostile work environment claim. Admittedly, the two to three

isolated discriminatory comments by co-workers alone would be insufficient to make out a

hostile work environment claim. While offensive, Tsarkov's racist remark on September 9, 2010

and LaPiana's racist remark on March 22, 2011,[40] occurred months apart and were made by-co-

workers.[41] (*See* Pl. Dep. at 256:11–13 (stating that the March of 2011 incident was the only time

---

[40] As detailed above in the background section, Plaintiff could not recall the words used
by LaPiana in the November of 2010 incident. (Pl. Dep. at 245:21–246:21.) In addition,
Plaintiff mentioned for the first time in opposition to summary judgment that LaPiana had
referenced his Jamaican heritage in the June 28, 2011 incident. (Pl. Decl. at 72, ¶ (N)(b)). This
assertion is inconsistent with Plaintiff's deposition testimony. The Court therefore disregards
this assertion. *See Raskin*, 125 F.3d at 63; *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012)
(affirming district court's decision to disregard "newly-remembered facts" where declarant failed
to explain how he could suddenly recall facts that he had previously testified he could not
remember). LaPiana's other comments were directed at Plaintiff's technical abilities without
reference to race. (*See* Pl. Opp'n 11 ("LaPiana often criticized Plaintiff's work in emails to
Ditinsky and other members of the project team. He often falsely accused Plaintiff of copying
other employee's work.").)

[41] Even adding to the consideration the June 28, 2011 incident, these incidents alone are
not sufficiently severe to alter the conditions of employment individually or in the aggregate.

LaPiana had expressly made a racist remark));[42] *Desardouin*, 708 F.3d at 105; *Rasko v. N.Y.C. Admin. for Children's Servs.*, 734 F. App'x 52, 55 (2d Cir. 2018) ("Isolated, minor acts or occasional episodes do not warrant relief." (quoting *Brennan*, 192 F.3d at 318)).  As discussed earlier, Plaintiff, however, has made a sufficient showing to preclude summary judgment as to his diminished duties retaliation claim.  If Plaintiff were to prevail on that retaliation claim, a reasonable jury could also conclude that Ditinsky, a supervisor, ultimately acted to give power to LaPiana's racist comments.  *See La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 210 (2d Cir. 2010) (holding that allegations that human resources department threatened plaintiff with termination and doubled his work in response to complaints of racism by co-workers were sufficient to preclude dismissal of complaint).  Viewed in the light most favorable to the non-movant, Plaintiff has provided sufficient evidence that LaPiana's comments, by way of Ditinsky, had the effect of altering "the conditions of employment . . . for the worse."  *Whidbee*, 223 F.3d at 70 (citation and emphasis omitted).

The Court therefore denies Defendant summary judgment as to Plaintiff's hostile work environment claim.

---

[42]  Plaintiff also informed Cox that Tsarkov's comment may have been "innocent" or "benign," even if upsetting.  (Pl. Dep. at 241:6–12.)

**III. Conclusion**

For the reasons discussed above, the Court grants in part and denies in part Defendant's motion for summary judgment. The Court denies summary judgment as to Plaintiff's Title VII (1) retaliation claim based on diminishment of duties and (2) hostile work environment. The Court grants summary judgment as to all other claims.

Dated: March 30, 2019
      Brooklyn, New York

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge